BETTY RICHARDSON, APPELLEE,
V. DAVID R. ANDERSON, APPELLANT.
604 N.W.2d 427

Filed January 11, 2000.  No. A-98-554.

Paul E. Galter, of Butler, Galter & O'Brien Law Firm, for appellant.

Gregory J. Beal, of Gregory J. Beal & Associates, P.C., for appellee.

HANNON, MUES, and INBODY, Judges.

HANNON, Judge.

## I. INTRODUCTION

In this action for modification of a paternity decree, David R. Anderson seeks a decrease in previously ordered child support upon the basis of a claimed decrease in earning ability. In this appeal, Anderson maintains that the trial court erred in applying

the unclean hands doctrine and that since the time of the original decree, there has been a material change in circumstances in that he has had a substantial decrease in income, resulting in his inability to pay the $675 per month ordered by this court in the previous appeal. We conclude that the trial court did not abuse its discretion in dismissing the application upon the basis of the unclean hands doctrine, and therefore we need not consider whether there might have been a change of circumstances. Accordingly, we affirm.

## II. BACKGROUND

Anderson and Betty Richardson had a relationship that resulted in the birth of Brendon Andrew Richardson on September 13, 1984. A paternity action was filed on December 16, 1987, and a decree finding Anderson to be the father of Brendon and ordering him to pay $400 per month was entered on July 27, 1990. Both parties appealed on the issue of the amount of support awarded. In *Richardson v. Anderson*, No. A-90-1006, 1992 WL 315093 (Neb. App. Nov. 3, 1992) (not designated for permanent publication), this court determined Anderson had an earning capacity of $50,000 per year and increased the child support to $675 per month retroactive to the time of the original decree. Anderson seeks to modify that child support award.

At the time of trial on Anderson's application for modification, he was 62 years old and had been married to his wife, Hazel Ilene (Ilene), for more than 30 years. She was 71 years of age. Anderson and Ilene reside in Lincoln, Nebraska, in the home they purchased in 1969. The house was titled jointly in Anderson's and Ilene's names, until approximately 1990 when the couple conveyed title to the home in Ilene's name only. Anderson testified that the mortgage against the home is approximately $155,000 and that there is a judgment against the home that was entered prior to the transfer of title to Ilene's name. Anderson has one other son named "Trent," by his marriage with Ilene. The record shows that at the time of trial, Trent was 30 years of age.

Anderson testified that in 1975, he underwent surgery to remove a herniated disk; that nerve damage in his back caused

his right leg to shrink "to half the size" of his left leg, resulting in a condition that caused his toes to curl up; and that he underwent two surgeries to straighten his toes. He testified that he had knee surgery, but he did not testify as to when. He testified that in the early 1990's, his back pain reoccurred; that he sought medical attention for that condition from a physician in Dallas, Texas; and that if he stands or walks for a period of time longer than 15 minutes, he feels pain in his left buttock that travels down his leg to his foot, causing his foot to go numb. He offered no medical or other evidence to support his testimony about his physical condition.

Anderson graduated from the University of Nebraska at Lincoln in 1961. Following college, Anderson worked for a pharmaceutical company selling prescription drugs throughout Nebraska until 1969. For a short time, he worked as a consultant that evaluated dentistry practices. From 1970 to 1976, Anderson went to work for a company based out of Minnesota that manufactured pacemakers and other medical equipment. After that, he formed a company called Medical Devices that contracted with Intermedics, Inc., to market and sell pacemakers. The evidence shows that Anderson was the president of Medical Devices. Anderson testified that in 1980 and 1981, while working for Medical Devices, he earned $500,000 a year.

Anderson testified that in 1982 and 1983 due to government regulations, his business was diminished by one-half, and that sometime in 1987, a sale of the company which supplied the devices he was selling terminated his services to sell the medical equipment. He filed an action against that company and ultimately settled the action for $1.7 million.

Sometime thereafter, the president of Intermedics notified Anderson that it was selling off the pacemaker portion of the business and would be canceling Anderson's contract. Anderson filed suit against Intermedics. The case was settled for a sum in excess of $2 million. After the income taxes and attorney fees were subtracted from both settlements, Anderson retained $2 million to $2.5 million. He testified that he transferred the funds from both settlements to Ilene's and Trent's money market accounts.

Anderson testified that while he was litigating with Intermedics from 1987 to 1989, three of his creditors took action, forcing him into involuntary bankruptcy. After the bankruptcy proceeding was converted to a chapter 11 bankruptcy, settlements were reached, and the funds received from the Intermedics settlements were used to pay the creditors. The federal court approved all settlements and dismissed the bankruptcy.

During the bankruptcy proceedings, Anderson sold 900 shares of a corporation's stock for $15,000 and neglected to list that asset on his bankruptcy schedules. He was indicted and eventually entered a plea of guilty to bankruptcy fraud. Anderson was incarcerated in a federal corrections facility in Yankton, South Dakota, from December 12, 1994, to September 1, 1996. While he was incarcerated, Anderson made a $25,000 payment on the child support judgment in order to remove a detainer that was placed upon him, thus obtaining his release from prison. Anderson was released from prison in September 1996 to a halfway house in Council Bluffs, Iowa, where he spent 30 days, and then, he transferred to house arrest in Lincoln. At the time of trial, he testified that he was serving a parole sentence of 3 years.

While Anderson was on house arrest in December 1996, he claims he engaged in the business of locating auto dealerships that were for sale. He located two dealerships but was allegedly never paid because the person who was supposed to pay him mysteriously died.

Sometime after Anderson was incarcerated, Ilene took a job as a salesperson at a department store, working 40 hours a week and earning $7 an hour. Ilene also receives approximately $535 in Social Security payments a month. Ilene has owned a beauty shop in North Platte, Nebraska, for 30 years. She manages the shop, does the bookkeeping, and receives an income; however, each year her expenses come close to offsetting her income. In 1990, her salon received $130,831 in rent but paid out $123,794 in expenses, retaining $6,365 in income. In 1991 and 1992, Ilene's income tax returns show a net income of $1,753 and $4,474, respectively.

Anderson testified to many business ventures that he has invested in. Beginning in the early 1970's, he and a few doctors

purchased 1,000 acres of land in Iowa and 1,200 cows. In late 1979, Anderson and several other people each invested $10,000 into auto racing. Anderson testified that he has not been involved with the auto racing business since 1987. He also invested in and bred show horses. Anderson testified that Diamond Head Ranches was formed in about 1980 and that the stockholders of the corporation were himself, Ilene, Wade White, and Trent may have been included as well. He further testified that during the mid 1980's, Diamond Head Ranch, Inc., was formed and that White was not involved. Anderson testified that the only stockholders of Diamond Head Ranch were Ilene and Trent.

At the time of trial, Anderson testified that Diamond Head Ranch owned eight horses and some farm equipment. He estimated that the eight horses were worth $10,000 to $15,000. Anderson has made investments in the corporation, but he explained that they were for the benefit of Trent.

The record is unclear, but it appears that at one time, the 320 acres of land located west of Lincoln, where Diamond Head Ranch has its headquarters, was owned by Anderson and Ilene. Anderson testified that Metropolitan Life Insurance Company filed a foreclosure action on 160 acres of land in 1985 and that there was a settlement made in 1987, giving Metropolitan Life Insurance Company 160 acres of land and the other 160 acres of land was purchased by El Rancho De Cabayo. We note that Trent was a stockholder of El Rancho De Cabayo.

From 1990 to 1992, Anderson was involved in a series of business ventures, including a mortgage banking company, a company that marketed ski racks, and a company that sold portable fluoroscopy for horses.

The record is unclear, but it seems as a result of Anderson's business ventures with Medical Devices and the mortgage banking company, Ilene and Trent received stock in Advanced Financial, Inc. At the time of trial, Anderson testified that Trent still owned several thousand shares but that the stock had minimal value and the company was allegedly bankrupt.

Anderson testified that he is living "[o]ff [his] wife" and that Trent has sold some of his assets to help support him. Anderson testified that since his release from the Yankton federal correc-

tions facility, he has purchased a watch, a hearing aid, and two pairs of jeans and that he drives a 1982 Ford van.

Norman Hedgecock was called as a witness by Anderson. Hedgecock is a certified public accountant, and since the early 1980's, he has been preparing income tax returns for Anderson. During Hedgecock's testimony, income tax returns for 1990, 1991, and 1992 were received into evidence. While testifying, Hedgecock did nothing more than recite the figures on each tax return that was provided. He offered no explanation as to where or why tax returns from 1993, 1994, 1995, 1996, and 1997 were not provided.

We observe that at first glance, the outdated income tax returns Anderson did produce show a progressive loss. In 1990, the tax return shows that Anderson had no earned income, and his Schedule C shows a loss of $42,762. A cursory review of the 1990 tax return shows that Anderson's list of expenses does not relate to the business of selling medical equipment. For example, he listed as "business expenses" an antique car expense totaling $14,500 and race car expenses in the amount of $2,686.

In 1991, the tax return shows that Anderson had no earned income, and his Schedule C shows a loss of $34,838. A closer review of his 1991 tax return shows an income of $14,182. The return shows that the personal property taxes total $6,301 and interest on Anderson and Ilene's home amounts to $15,137. Again in 1991, Anderson listed a race car as a "business expense" in the amount of $7,019. We note the inconsistency between these figures and Anderson's testimony. Anderson testified more than once that he stopped investing in the auto racing industry in 1987, but his tax returns reflect otherwise.

Hedgecock also testified that Anderson's 1992 Schedule C reflected a $22,203 Schedule C loss. In 1992, the return shows that the taxes paid on the house were $5,707 and the interest paid was $10,651. The 1992 tax return reflects a net long-term capital gain of $78,320. We also note that the 1992 tax return also reflects a horse racing business in Ilene's name that earned a gross income of $26,693 and then was offset by operating expenses in the amount of $26,693.

Richardson testified about her situation, her lack of earnings, her needs, and Brendon's needs. Her testimony relates primarily

to her application to increase the child support. The trial court denied her application, and as we explain below, we hold she did not appeal that action. Furthermore, the trial court's decision is based upon Anderson's lack of clean hands and not upon any determination relating to her circumstances. Therefore, we will not summarize Richardson's testimony.

In the trial court's order denying both applications for modification, it made detailed findings. The most significant of its findings are that Anderson has evaded his financial responsibilities to Brendon; that Anderson's transfer of $1.85 million to Ilene and Trent in 1988, while the paternity action was pending, is the cause of his difficulty in paying child support; and that Anderson's conviction and prison sentence for fraud is not a legal excuse for his failure to pay support. The court also found that as of February 5, 1998, Anderson was in arrears $18,073.94 on child support, $2,500 on attorney fees awarded in 1995, and $3,555 on attorney fees awarded in 1990. It found that in spite of his claimed physical disabilities, Anderson still possessed his skills in sales that had allowed him to earn considerable sums in the past.

The court also found that Anderson failed to convince the court that he had acted in good faith, that he had paid only two sums of $50 on the child support judgment since August 1996 when he paid $25,000 on child support in order to remove a detainer placed upon him while in federal prison, and that he failed to have income tax returns prepared for the years 1993 through 1997.

The trial court found that Anderson was not entitled to the relief prayed for due to his " 'unclean hands' " as provided in *Voichoskie v. Voichoskie*, 215 Neb. 775, 340 N.W.2d 442 (1983), and that Richardson had not carried her burden of proof on her application for increased support or work-related day-care expenses. The court dismissed both applications and awarded Richardson $500 in attorney fees.

### III. ASSIGNMENTS OF ERROR

Anderson alleges that the court erred (1) in failing to reduce his obligation to pay child support and to make the reduction retroactive, (2) in concluding that Anderson had an earning

capacity sufficient to enable him to pay child support previously ordered, (3) in denying him relief on the basis of unclean hands, and (4) in finding that his failure to pay child support was willful. Whether the trial court's denial of relief on the basis of unclean hands is the controlling issue of this appeal and our determination of that issue make consideration of the other assignments of error unnecessary.

## IV. STANDARD OF REVIEW

■ Modification of the amount of child support payments is entrusted to the discretion of the trial court, and although, on appeal, the issue is reviewed de novo on the record, the decision of the trial court will be affirmed absent an abuse of discretion. *Faaborg v. Faaborg*, 254 Neb. 501, 576 N.W.2d 826 (1998); *Marr v. Marr*, 245 Neb. 655, 515 N.W.2d 118 (1994).

■ A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through the judicial system. *Hoshor v. Hoshor*, 254 Neb. 743, 580 N.W.2d 516 (1998); *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997).

## V. ANALYSIS

### 1. UNCLEAN HANDS

Anderson argues that the trial court erred when it denied him relief on the basis of unclean hands and finding that his failure to pay child support was willful. The doctrine of unclean hands may operate to bar an application for modification of an award of child support. That doctrine was introduced into Nebraska jurisprudence in *Voichoskie v. Voichoskie*, 215 Neb. 775, 340 N.W.2d 442 (1983) (*Voichoskie I*), and further developed in the second appeal after remand, *Voichoskie v. Voichoskie*, 219 Neb. 670, 365 N.W.2d 467 (1985) (*Voichoskie II*).

The *Voichoskie I* court stated:

> The conduct which forms a basis for a finding that a party has "unclean hands" must be willful in nature. "The maxim refers to willful misconduct rather than merely neg-

ligent misconduct. The improper conduct which falls within the maxim must involve intention as opposed to an inadvertent act or a misapprehension of legal rights." 30 C.J.S. *Equity* § 95 at 1021-22 (1965). "If the party seeking the relief has been *guilty of any conduct offensive to the conscience*, the remedy may, of course, be denied, under the familiar maxims of equity." (Emphasis supplied.) *Bauer v. Bauer*, 136 Neb. 329, 331, 285 N.W. 565, 567 (1939). "That status [unclean hands] is acquired by 'willful conduct which is fraudulent, illegal or unconscionable.'" *Seal v. Seal*, 212 Kan. 55, 62, 510 P.2d 167, 173 (1973).

In cases in which a party owes past due alimony or child support, the courts have generally held that the failure to pay must be found to be a willful failure in spite of an ability to pay before a request for modification of a decree may be dismissed on the basis of "unclean hands."

215 Neb. at 777, 340 N.W.2d 444.

The *Voichoskie II* court summarized the rule in *Voichoskie I* to be: "[T]he general holding that when a party owes past due child support, the failure to pay must be found to be a willful failure in spite of ability to pay before a request for modification of a decree may be dismissed on the basis of unclean hands." 219 Neb. at 672, 365 N.W.2d at 469. In *Voichoskie I*, the application to decrease support was held barred by the trial court under the unclean hands doctrine. The applicant had made some payments but was in arrears. His income at the time of the hearing had decreased, and it was clear that he could not pay the whole arrearage, but he could have paid more than he paid. In *Voichoskie II*, the Nebraska Supreme Court stated that the applicant was an able-bodied man capable of being employed and capable of paying child support; that when he had worked full time, his earnings went to others, not his children; and that these findings justified dismissing his application to decrease support. We note that in *Voichoskie I*, there is no evidence or contention that Voichoskie had the ability to pay the child support at the time of the modification hearing, but, rather, the evidence showed that he did not pay the support which he had had the ability to pay in the past and that of course, he was not paying

any support at the time of the hearing on the application to decrease support. In *Voichoskie II*, the court stated the unclean hands doctrine could be applied if the applicant was able to pay the arrearage and did not do so, or if he is unable to pay through some intentional conduct in the past.

In this case, the trial court found that Anderson's skills in sales allowed him to earn a substantial income which would enable him to meet his support obligation, and it also found that the transfer of money to Ilene and Trent caused his difficulty in paying the ordered child support. These findings are effectively findings that Anderson had the ability to currently pay some child support, although perhaps not all of it, and that he was unable to pay the support through some intentional act in the past, that is, transferring money to Ilene and Trent. Both reasons are intertwined, but we will discuss them separately.

### (a) Ability to Pay Arrearage

The argument in Anderson's brief amounts to a recitation of his evidence on the decline of his financial status since the mid-1980's. Although the evidence shows that Anderson is not able bodied, he was only 62 years of age at the time of trial, and his work history is in sales, not in endeavors requiring him to be able bodied. We doubt if any court would find that Anderson does not have a significant earning capacity, even though he could not hope to return to his former high earnings. The evidence shows that he continues to engage in business activity since his release from incarceration. It does not show why his current business activity does not result in earnings to him. He does not explain why he does not earn an income or why he does not seek employment that would realize earnings to him. With Anderson's past conduct, almost anyone would suspect his business endeavors are probably intended to realize money for Ilene and Trent, who support him. However, there is no evidence to support such a finding. There is no evidence showing that a man of his considerable entrepreneurial experience could not become employed in a capacity which would enable him to earn significant income. Even if one assumes that Anderson has not made any money since his release from prison because he has been unsuccessful in the various ventures he has attempted, he has the

obligation to become employed in a capacity which would enable him to support Brendon. A parent has no right to insist upon the pursuit of fruitless dreams of success. There comes a time when a parent who is a would-be entrepreneur but is unsuccessful must simply become employed. The fact that Anderson's support is supplied by others and therefore he may not have any income does not relieve him of the duty to support Brendon.

While Anderson maintains he has no income with which to pay child support, he and Ilene continue to live in the same house that they purchased in approximately 1969. By an admission Anderson made under oath in 1989, he valued that house somewhere between $300,000 and $400,000. This is the same home that Anderson and Ilene owned jointly until Anderson transferred all of his interest in the home over to Ilene. In our previous opinion, we observed that the real estate taxes on that house were $4,251 per year. He claims that Ilene had to become employed in a department store after he was incarcerated, and that otherwise, she has only Social Security payments as income. We are not convinced that they could live in such a grand house on that small of an income. By these observations, we are not implying Ilene has the duty to support Brendon. We are however suggesting that Anderson cannot remain unemployed while he lives in an impressive style and use that lack of employment as an excuse for not paying child support.

The *Voichoskie II* court mentioned the fact that Voichoskie had not paid any support when he was employed. Similarly, Anderson did not support Brendon when he was worth millions of dollars. During that time, Anderson was defrauding creditors, including Richardson, by transferring a fortune to Ilene and Trent. He made one large payment of child support, but only to get himself out of prison. Otherwise, he has paid only $100. Anderson's willful misconduct in failing to pay the previously ordered child support is clearly greater than Voichoskie's failure in that respect.

In the previous appeal, this court found Anderson to be evasive and unknowledgeable with respect to his own business affairs. In the present case, we observe that little has changed. During cross-examination, Anderson became both argumentative and evasive, repeatedly testifying "I don't know" and

"I can't recall" to questions regarding his personal financial matters. During a discovery deposition, Anderson refused to answer several interrelated questions pertaining to his failure to produce more than the first two pages of his income tax returns.

## (b) Past Fraudulent Activity

Anderson transferred a fortune to Ilene and Trent. The trial court found that this intentional transfer was the cause of his difficulty in paying child support. The record certainly supports the trial court's finding in that regard. This fraudulent transfer must be unique in terms of size in child support litigation. The unexplained transfer of so much money to close and amicable relatives necessarily soils the hands of the transferor in any litigation over child support for a very long time, if not indefinitely. This is particularly true when there are only generalized explanations as to what happened to the money after it was transferred, while the donees provide the donor with support.

Anderson argues that the cash settlements were used to pay off his bankruptcy settlements. His testimony that the money settlements have been "paid out" was unsupported by any corroborating evidence and altogether unconvincing. Anderson failed to clearly explain how he disposed of his assets, and as a result, he has not convincingly accounted for what happened to the $1.85 million.

Not only did Anderson transfer substantial money to Ilene and Trent, but he also transferred title to Anderson and Ilene's home to Ilene in approximately 1990. Additionally, Hedgecock testified that after Anderson's 1992 tax returns were prepared, Anderson told him that he transferred his stock in Diamond Head Ranch over to Ilene. "An interspousal transfer of property in close proximity to the incurrence of a substantial child support obligation may constitute evidence of fraudulent intent under the [Uniform Fraudulent Transfer] Act and may result in the transfer being set aside pursuant thereto." *Rich v. Rich,* 185 W. Va. 148, 154, 405 S.E.2d 858, 864 (1991). Furthermore, when "a transfer [is] made by a debtor 'to a family member in the face of a creditor's potential claim, the grantor's intent warrants especially careful scrutiny.' " *Varner v. Varner,* 662 So. 2d 273, 276 (Ala. Civ. App. 1994).

However, the fraudulent transfer of property is not the only past misconduct which justifies the application of the unclean hands doctrine to deny a decrease in child support in this case. It is clear that Anderson did not pay the support during times when he had the means to pay it.

In *Ohler v. Ohler*, 220 Neb. 272, 369 N.W.2d 615 (1985), it was held that incarceration for violating the criminal law, even when the incarceration resulted in a parent having no income to pay child support, did not justify a modification. While that decision was not bottomed exclusively on the unclean hands doctrine, that doctrine was mentioned in the court's consideration of the issue. The same notion was extended in *Pope v. Pope*, 251 Neb. 773, 559 N.W.2d 192 (1997), when an application to decrease alimony was denied because the change of circumstances upon which the applicant moved for a decrease was a decrease of income resulting from the applicant's having been fired for sleeping on the job. In this case, Anderson's inability to pay child support for at least some period of time in the past was obviously due in part to his imprisonment. It is clear that Anderson's financial difficulty resulted from his criminal activity in transferring assets to avoid paying creditors.

Upon our de novo review, we find that Anderson's application should be dismissed under the unclean hands doctrine for the several reasons reviewed above. We conclude that the trial court did not abuse its discretion by dismissing Anderson's application to decrease child support. We therefore need not review the evidence which might have justified a decrease in child support if the unclean hands doctrine was not applicable.

## 2. RICHARDSON'S POSSIBLE CROSS-APPEAL

On the last page of Richardson's brief, she argues that instead of reducing the amount of Anderson's child support obligation, we should consider increasing it or, for that matter, order that the support relate back to the birth of Brendon.

Richardson failed to comply with the requirements of Neb. Ct. R. of Prac. 9D(4) (rev. 1996), in that she did not designate a cross-appeal on the cover of her brief, nor did she set forth the cross-appeal in a separate section of her brief. Richardson merely added an additional argument to the last page of her

brief, and there were no indications that it was intended to be a cross-appeal. We rely upon the firmly established rule that in order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. See *Lange v. Crouse Cartage Co.*, 253 Neb. 718, 572 N.W.2d 351 (1998). Second, it is also firmly established that errors which are argued but not assigned will not be considered by an appellate court. *DeCoste v. City of Wahoo*, 255 Neb. 266, 583 N.W.2d 595 (1998). We conclude that Richardson failed to properly designate her argument as a cross-appeal, and we refuse to address such argument here.

## VI. CONCLUSION

We conclude that the trial court did not abuse its discretion in dismissing Anderson's application upon the basis of the unclean hands doctrine. Accordingly, we affirm.

AFFIRMED.

SIEVERS, Judge, participating on briefs.
MUES, Judge, not participating in the decision.