RAYMOND BOREN, APPELLEE, V. THE BURLINGTON NORTHERN & SANTA FE RAILWAY COMPANY, FORMERLY KNOWN AS BURLINGTON NORTHERN RAILROAD COMPANY, A DELAWARE CORPORATION, APPELLANT.

637 N.W.2d 910

Filed January 15, 2002. No. A-00-894.

Rodney M. Confer, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., and, on brief, Cheryl R. Zwart for appellant.

Richard J. Dinsmore for appellee.

Irwin, Chief Judge, and Inbody and Carlson, Judges.

Irwin, Chief Judge.

## I. INTRODUCTION

The Burlington Northern & Santa Fe Railway Company (Burlington) appeals from a jury verdict in favor of Raymond Boren in his Federal Employers' Liability Act (FELA) action for exposure to toxic chemicals over a period of 30 years while working for Burlington. On appeal, Burlington challenges, inter alia, the trial court's denial of two motions for summary judgment, the trial court's allowance of various expert testimony, the jury instructions given by the trial court, and the trial court's denial of motions for directed verdict and judgment notwithstanding the verdict. For the reasons discussed at length herein, we find no merit to Burlington's assertions on appeal and affirm.

## II. BACKGROUND

This case presents, in the context of FELA, what is commonly referred to as a "toxic tort" case. As such, the case is replete with complex medical terminology and railroad terminology, and the record consists of nearly 2,000 pages of testimony, exclusive of exhibits. As much as practicable, we will set forth the relevant background here in as basic terms as possible.

Boren was born in December 1940. Boren began working for the railroad in 1964. Boren initially worked for Burlington Refrigerated Express in Pacific Junction, Iowa, as a laborer, cleaning out railcars and "picking up various things." Boren then became an "apprentice carman," working "in the shadow" of another carman. Boren became a carman in approximately 1971. In that role, Boren was responsible for making sure that "everything was working right" on the railcars, including the mechanics of the refrigeration unit.

In fall 1977, Burlington Refrigerated Express discontinued the refrigeration line in this part of the country, and Boren went to work for Burlington. Boren began with Burlington working at Gibson Yard (Gibson) in Omaha, Nebraska. Gibson was a receiving and departing yard, which included an area for repairing railcars. While working as a carman at Gibson, Boren would straighten handholds and doorsills, make sure all doors on the railcars would close tightly, change brake shoes and wheels, and "repack journals." The record indicates that journals are part of the wheel on railcars and include bearings and weights that are removed and then cleaned with a cleaning solvent and oiled.

Boren testified that each railcar had eight journals and that two or three times per week he worked on cleaning and repacking journals. During these times, Boren would use a 5-gallon bucket of solvent for 2 to 4 hours per railcar. The 5-gallon bucket of solvent would be filled from a larger 55-gallon drum. According to Boren, he was never provided with any protective breathing apparatus, specialty gloves, or education and direction concerning the use of this solvent. Boren testified that using the solvent would cause his hands to get "real chapped and red" and that they would sometimes "split and break open on the ends."

In 1982, Boren transferred from Gibson to the Havelock Shop (Havelock) in Lincoln, Nebraska. While working at Havelock, Boren began transitioning toward doing inspection work. Boren began doing some inspection work, in addition to his regular duties as a carman, in fall 1984. In 1986, Boren began doing inspection work on a full-time basis. In 1990, his full-time inspection job was abolished, and he again did carman duties and some occasional inspection work. He continued doing occasional inspection work at the scales at Havelock until 1992.

In doing inspection work, Boren was required to inspect railcars coming out of the paintshop for defects. Boren checked the couplers that connected the railcars, checked the sides of the railcars, stenciled the load and weight limits on the side of the railcars, checked hatch covers on the railcars, and looked inside the railcars for other defects in the railcar or the paint inside the railcar. Boren inspected railcars that had Marblethane-coated floors and railcars that had been painted on the inside with Polyclutch paint. When inspecting the railcars with Marblethane-coated

floors, Boren would open the door and look inside the railcars. When inspecting the Polyclutch-painted railcars, Boren would be required to climb on the roof of the railcar, open a hatch on the roof, and lower his head inside the railcar to inspect the interior. In addition to the inspection of the railcars, Boren would be required to clean stencils by placing them into a tank full of solvent, soaking them, and then cleaning them off with a rag.

Boren also testified to the use of an aerosol to loosen bolts at both Gibson and Havelock. According to Boren, the aerosol was sprayed onto various bolts to loosen them when they could not be cut off the railcars and had to be removed with a wrench. Boren also testified to using a liquid graphite product when removing couplers from the railcars. Boren testified that the liquid graphite would be stirred and then applied onto the couplers with either a brush, stick, or rag.

In February 1993, Boren was hospitalized. Boren testified that his health had generally been "good" prior to the middle of 1992. At that time, he began suffering fatigue. In February 1993, Boren suffered a severe headache, went to see his doctor, and was hospitalized for problems associated with his liver and esophageal varices. After being hospitalized, Boren was off work from February to September 1993. He then returned to work through the end of 1993. Boren underwent surgery in January 1994 to have a distal splenorenal shunt inserted. Boren again returned to work in June 1994. He took a job with Burlington doing full-time inspection work where he was no longer exposed to chemicals.

On March 29, 1996, Boren filed a second amended petition. In the petition, Boren alleged that during his employment with Burlington, he was exposed to a variety of organic chemicals, including 1,1,1-trichloroethane, petroleum distillates, toluene, and xylene. Boren alleged that Burlington was negligent in failing to provide necessary tools and equipment, failing to warn of the dangers presented by the solvents, failing to provide adequate ventilation, and failing to adequately train employees concerning use of the chemicals. Pursuant to FELA, Boren sought compensation for damages he alleged were sustained as a result of his exposure to the various chemicals. Specifically, Boren alleged that he suffered "cirrhosis of the liver and esophageal varices" as a result of his exposures.

On June 18, 1998, Burlington filed its first motion for summary judgment. Burlington offered Boren's deposition and answers to interrogatories, the affidavits of a retired Burlington employee and a doctor, and the deposition of another doctor. In response, Boren offered excerpts from Boren's deposition, Material Safety Data Sheet(s) (MSDS) concerning various chemicals Boren alleged exposure to, medical journals concerning liver damage associated with exposure to the various chemicals, an affidavit from Boren's treating physician, and an article from the National Institute of Occupational Safety and Health (NIOSH). On February 25, 1999, the court denied Burlington's first motion for summary judgment. The court received all the exhibits offered by Burlington and Boren and ruled that there were genuine issues of material fact relative to Burlington's alleged negligence.

On February 18, 2000, Burlington filed its second motion for summary judgment. On February 25, Burlington filed a motion in limine seeking to prevent Boren from presenting evidence concerning various chemicals and MSDS. Another motion in limine, which appears to be substantially identical to the February 25 motion, was filed by Burlington on March 22. Burlington's second motion for summary judgment and motion in limine were both heard by the court at the same time. In support of the motions, Burlington offered depositions of various doctors, documents concerning predecessor entities of the Burlington company, responses to interrogatories, NIOSH documents, medical treatises, and the deposition of an industrial hygiene expert, and Burlington reoffered the evidence presented at the hearing on the first motion for summary judgment. In response, Boren offered the curriculum vitae of various doctors, offered an affidavit indicating what various doctors would be testifying to, and reoffered the evidence presented at the hearing on the first motion for summary judgment. On March 28, the court entered an order denying both motions.

The case came on for trial before a jury on April 3 through 12, 2000. The trial record consists of more than 1,100 pages of testimony, in addition to two videotape depositions which amount to more than 300 additional pages of transcribed testimony. In addition, there are more than 150 exhibits composing 7 additional volumes of record.

During the 8 days of trial, the jury heard testimony concerning Boren's employment history as set forth above. Additionally, the jury heard testimony concerning specific chemicals and specific solvents used by Boren during the course of his employment and heard testimony concerning whether those chemicals caused Boren's liver disease.

Boren testified that when cleaning journals at Gibson, the solvent used was called "Stay-Kleen (sic) or something like that." According to Burlington's counsel, stay-kleen and Safety-Kleen were presumed to be the same thing. Another employee testified that mineral spirits was used in cleaning journals. Boren testified that the aerosol product used to loosen bolts said "something about 666 on it." Other evidence at trial indicates this product was 6-66 (aerosol). Boren testified that he inspected railcars that had their floors treated with Marblethane and other railcars that had been painted with Polyclutch. Boren testified that he used Polyclutch thinner to clean stencils. Boren testified that he also used a liquid graphite product to loosen couplers. This liquid graphite was apparently called Part-Ease.

Boren presented the evidence of Dr. Michael Ellenbecker, an industrial hygiene expert, who testified that petroleum distillates are a group of organic solvents that go by a variety of names, including Stoddard solvents, naphtha, mineral spirits, and Safety-Kleen. He further testified that the Marblethane Boren was exposed to contain a chemical called xylene and that 6-66 (aerosol) contains 1,1,1-trichloroethane.

MSDS received at trial indicate that Safety-Kleen is synonymous with petroleum distillates, mineral spirits, and Stoddard solvent and contains, among other chemicals, toluene, xylene, and 1,1,1-trichloroethane. MSDS received at trial indicate that lacquer thinner and Polyclutch solvent contain, among other chemicals, toluene and xylene. MSDS received at trial indicate that 6-66 (aerosol) contains, among other chemicals, petroleum distillate and 1,1,1-trichloroethane. MSDS received at trial indicate that Marblethane contains, among other chemicals, toluene and xylene. MSDS received at trial indicate that Part-Ease liquid graphite contains, among other chemicals, 1,1,1-trichloroethane. MSDS received at trial indicate that Polyclutch contains, among other chemicals, toluene and xylene.

During the trial, the jury heard medical evidence that toluene, xylene, 1,1,1-trichloroethane, petroleum distillates, and mineral spirits are a class of materials that "are well known for their ability and propensity to cause liver damage." The jury heard evidence that in Boren's case, other causes of his liver disease, including alcohol consumption or hepatitis, had been ruled out. The jury heard medical testimony that Boren had been exposed to a variety of organic solvents and chemicals known to produce liver disease in an amount such that liver disease resulted from the exposure over a number of years while working for Burlington. Burlington presented various evidence generally contradicting the evidence presented by Boren on causation.

The jury also heard testimony concerning Boren's medical problems after 1993. Boren presented testimony concerning changes in his lifestyle, including changes in the hobbies he pursued both before and after his medical problems began. Additionally, Boren testified concerning his ability to assist his wife in caring for their son, who suffers severe medical problems.

At the conclusion of Boren's case, Burlington moved for a directed verdict. Burlington asserted that Boren had failed to adduce sufficient evidence of negligence on Burlington's part and failed to adduce sufficient evidence that his liver disease was caused by the exposure to chemicals while employed by Burlington. Burlington's motion was overruled.

The jury ultimately returned a verdict in favor of Boren. The jury awarded Boren a judgment of $500,000. Burlington subsequently moved for a judgment notwithstanding the verdict or, in the alternative, a new trial. The court denied these motions. This timely appeal followed.

### III. ASSIGNMENTS OF ERROR

Burlington has assigned 10 errors on appeal, which we consolidate for discussion to 7. Burlington asserts (1) that the trial court erred in admitting expert testimony offered by Boren at various stages of the proceedings, (2) that the trial court erred in receiving MSDS offered by Boren at various stages of the proceedings, (3) that the trial court erred in denying two motions for summary judgment filed by Burlington prior to the trial, (4) that the trial court erred in overruling a motion in limine concerning

testimony about certain chemicals, (5) that the trial court erred in allowing a portion of a medical treatise to be read into evidence during the trial, (6) that the trial court erred in giving jury instructions objected to by Burlington, and (7) that the trial court erred in overruling various posttrial motions filed by Burlington.

## IV. ANALYSIS

### 1. STANDARD OF REVIEW

FELA preempts state law and statutorily supplies uniform law controlling a railroad employee's claim for damages caused by negligence of the employer railroad while the employee is engaged in the railroad's interstate commerce activity. *Gustafson v. Burlington Northern RR. Co.*, 252 Neb. 226, 561 N.W.2d 212 (1997). Courts of the United States and courts of the several states have concurrent jurisdiction over claims controlled by FELA. *Crafton v. Union Pacific RR. Co.*, 7 Neb. App. 793, 585 N.W.2d 115 (1998). See 45 U.S.C. § 56 (1994). In disposing of a claim controlled by FELA, a state court may use procedural rules applicable to civil actions in the state court unless otherwise directed by the act, but substantive issues concerning a claim under FELA are determined by the provisions of the act. *Crafton v. Union Pacific RR. Co., supra.* Procedural matters are dictated by the law of the forum. *Id.* The traditional concept of proximate cause is abrogated in FELA cases by the fact that the plaintiff's proof is sufficient to state a claim if it shows that the carrier's negligence, however slight, played some part in causing the injury. *Naidoo v. Union Pacific Railroad*, 224 Neb. 853, 402 N.W.2d 653 (1987).

### 2. EXPERT TESTIMONY

Burlington first challenges the trial court's decision to admit expert testimony offered by Boren. Specifically, Burlington asserts that the expert testimony offered by Boren failed to meet the general standards of admissibility for expert testimony in Nebraska. Burlington asserts that Boren presented no admissible evidence concerning medical causation of his liver cirrhosis.

### (a) Admissibility in General

Generally, the admissibility of evidence is a procedural matter governed by the law of the forum. *Crafton v. Union Pacific*

*RR. Co., supra.* In Nebraska, a lower court's ruling in receiving or excluding an expert's opinion which is otherwise relevant will be reversed only when there is an abuse of discretion. *Id.*

In the present case, Burlington has argued on appeal that Boren's proffered expert testimony should have been excluded under both the doctrine announced in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and the general test for admissibility of expert testimony in Nebraska. See *Crafton v. Union Pacific RR. Co., supra.* We find that the methodology employed by Boren's experts was generally accepted in the relevant scientific community and that accordingly, the standard of *Frye v. United States, supra*, was satisfied. We also find that the proffered testimony satisfied the general test for admissibility of expert testimony in Nebraska.

### (i) Frye *Standard*

Until recently, the Nebraska Supreme Court had mandated that courts of this state use a different standard for determining the admissibility of expert testimony from that used by the federal courts. See *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). In the case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), the U.S. Supreme Court redefined the standard for admission of expert testimony in federal courts to provide that pursuant to Fed. R. Evid. 702, expert testimony may be admitted if scientific or specialized knowledge will assist the trier of fact and if the witness is properly qualified as an expert. In that case, the Supreme Court annunciated numerous factors to be considered in determining the reliability of an expert's proffered opinion to assess whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact. The Court noted that the inquiry should be a flexible one designed to assess the scientific validity and reliability of the principles underlying a proposed opinion.

Prior to the Nebraska Supreme Court's opinion in *Schafersman v. Agland Coop, supra*, the Nebraska Supreme Court had adhered to a different standard for the admissibility of expert testimony and reaffirmed the standard set forth in *Frye v. United States, supra.* As such, prior to the court's opinion in

*Schafersman v. Agland Coop, supra,* expert testimony in Nebraska concerning a novel form of expertise was admissible if the principle, technique, or process upon which the opinion was based was generally accepted in the relevant scientific community. Although the Nebraska Supreme Court adopted the *Daubert* test and abandoned the *Frye* test in *Schafersman,* the court specifically noted that the new rule would apply only for trials commencing on or after October 1, 2001. As such, the initial inquiry in this case is whether the proffered expert testimony satisfies the test of *Frye.*

Under the *Frye* test, the admissibility of an expert's testimony, including an opinion, which is based on a scientific principle or on a technique or process which utilizes or applies a scientific principle, depends on general acceptance of the principle, technique, or process in the relevant scientific community. *Schafersman v. Agland Coop, supra.* Stated otherwise, the proponent of the evidence must prove general acceptance by surveying scientific publications, judicial decisions, or practical applications or by presenting testimony from scientists as to the attitudes of their fellow scientists. *Id.*

In the present case, Burlington specifically challenges the medical causation opinions given by Drs. Jeremiah Donovan, Richard Clapp, and Arthur Frank. Boren's medical experts based their opinions on what is known as differential diagnosis. Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. *Westberry v. Gislaved Gummi AB,* 178 F.3d 257 (4th Cir. 1999). According to federal courts, this technique has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results. *Id.* The admission of an expert opinion on causation based on differential diagnosis has been upheld by the federal courts. *Id.*

Drs. Donovan and Frank both testified that other potential causes of Boren's cirrhosis had been ruled out in the present case. Both testified, in addition, that a long history of medical journals and peer-reviewed articles indicated that exposure to the various chemicals involved in this case can cause cirrhosis.

Both opined that based on this differential diagnosis, Boren's cirrhosis was caused by his long-term exposure to the variety of chemicals at issue.

Dr. Clapp testified that he had reviewed the various MSDS concerning the chemicals at issue, as well as information from NIOSH and peer-reviewed medical journals. Dr. Clapp testified that MSDS are generally accepted to be accurate. Based on those resources, Dr. Clapp testified that Boren was exposed to a substantial amount of solvents consistent with literature indicating that the same solvents cause cirrhosis. He testified that this causal relationship is shown in medical articles as early as 1982, and perhaps as far back as the 1960's.

In *Schafersman v. Agland Coop.*, 262 Neb. 215, 631 N.W.2d 862 (2001), the Nebraska Supreme Court noted that the *Frye* test is to be employed when a court is faced with an offer of a novel form of expertise which has not yet received judicial sanction. In such a case, the court must conduct an initial inquiry to determine whether the new technique or principle is sufficiently reliable to aid the jury in reaching accurate results. *Id.* A review of the record in the present case, as set forth above, reveals that the expert testimony being offered by Boren's medical causation witnesses was not an offer of a novel form of expertise. There is no indication anywhere in the record that the methodology utilized by Boren's experts was novel. Indeed, federal cases have expressly adopted the methodology of differential diagnosis. As such, we conclude that the *Frye* standard was satisfied with regard to the proffered testimony of Drs. Donovan, Clapp, and Frank.

### (ii) General Test for Admissibility

In Nebraska, in determining whether an expert's testimony is admissible, a court considers four preliminary and interrelated questions: (1) whether the witness qualifies as an expert pursuant to Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1995); (2) whether the expert's testimony is relevant; (3) whether the expert's testimony assists the trier of fact to understand the evidence or determine a controverted factual issue; and (4) whether the expert's testimony, even though relevant and admissible, should be excluded under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995), because its

probative value is substantially outweighed by the danger of unfair prejudice or other considerations. *Crafton v. Union Pacific RR. Co.*, 7 Neb. App. 793, 585 N.W.2d 115 (1998). We conclude that the trial court did not abuse its discretion in concluding that this general test was satisfied.

Burlington asserts on appeal that the medical causation experts lacked a proper factual basis for their opinions because they did not have information on the specific chemicals Boren was exposed to and did not have information on the specific dose, length, or level of exposures. The bulk of Burlington's brief on appeal is devoted to arguing that Boren failed to adduce any specific evidence concerning the specific doses of the various chemicals to which he was exposed and that absent such proof, the experts' opinions should have been ruled inadmissible. We conclude that there was sufficient evidence of both the specific chemicals to which Boren was exposed and the level of exposure.

As noted in the factual background, Boren himself testified that he used products such as Safety-Kleen, 6-66 (aerosol), Marblethane, Polyclutch, Polyclutch thinner, and Part-Ease liquid graphite. Other employees of Burlington testified similarly concerning the products that were used and the methods of use in carrying out the employment responsibilities at Burlington. There was evidence presented to indicate that these products contained various chemicals such as mineral spirits, toluene, xylene, and 1,1,1-trichloroethane. Burlington adduced testimony via cross-examination that the MSDS which showed the chemical compositions of the various products could have been slightly different during the times of Boren's exposures. However, Boren presented evidence indicating that the specific chemical makeup of the various products would vary only slightly from one time period to another. Additionally, Boren presented testimony from Dr. Frank that no specific chemical could be pinpointed as a cause, but, rather, that the mixture of these chemicals over a period of years is what caused Boren's problems. As such, we conclude that the trial court did not abuse its discretion in concluding that there was sufficient evidence of the specific chemicals to which Boren was exposed.

There is no dispute that Boren was unable to present any specific information concerning the dose or level of any of the

chemicals to which he was exposed. Burlington asserts that such evidence was necessary before the proffered expert opinions could be deemed admissible. As noted, this argument comprises the bulk of Burlington's brief on appeal. However, we conclude that Boren did not need any more specific evidence than was presented on this issue.

Boren presented general testimony concerning how often he would use the various chemicals and for how long he would use them on various occasions. Other employees of Burlington that testified also testified concerning how long various tasks would take, during which time an employee would be exposed to the chemicals. However, Boren had no specific evidence concerning exact dosage levels.

Dr. Frank testified that in his experience as a specialist in occupational medicine, information on specific dosage levels is generally unavailable. He testified that there is generally no way for an employee to measure such levels or doses of exposure and that the only way such information would be available would be if the employer were to make measurements and keep records. Dr. Frank testified, however, that such specific information is not necessary to form an opinion on causation. Dr. Frank testified that such specific information is not necessary when conducting a differential diagnosis because there was evidence that Boren was exposed to the variety of chemicals over a period of years, that there was evidence that such exposure could cause the medical problems experienced by Boren, and that there was evidence to rule out other possible causes of Boren's medical problems. In addition, Dr. Frank testified that the fact that Boren had acute reactions to the chemicals on a number of occasions, including skin reactions, breathing problems, and headaches, was indicative of the level of exposure being adequate to form an opinion on causation.

Although Burlington cites this court to a number of federal cases that have held, on their particular facts and records, that expert opinions were inadequate without specific evidence of levels or doses of exposure, we find them unpersuasive in the instant case. See, *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999); *Mitchell v. Gencorp, Inc.*, 165 F.3d 778 (10th Cir. 1999) (concerning need for quantifiable evidence of levels

of exposure); *Savage v. Union Pacific R. Co.*, 67 F. Supp. 2d 1021 (E.D. Ark. 1999). In the present case, there was specific evidence presented that an opinion of causation is not dependent on having evidence of specific levels of exposure. Boren did not need to produce a mathematically precise table equating levels of exposure with levels of harm in order to show that he was exposed to a toxic level of the various chemicals. See *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924 (8th Cir. 2001). Rather, he needed only to present evidence from which a reasonable person could conclude that his exposure probably caused his injuries. See *id.*

On the specific facts of the present case, Boren established that over a period of 30 years, he was exposed to a variety of chemicals. He established in general terms the length of time he would spend using the various chemicals. He testified regarding acute reactions to the symptoms. He presented evidence of other workers to confirm the acute reactions experienced by other workers. He presented evidence that ruled out other causes of his medical condition. He presented evidence that various medical literature has long suggested a causal link between the chemicals he was exposed to and the medical condition he experienced. He also presented evidence that all of these factors are sufficient to form the basis of an opinion on causation. On these specific facts, we do not find that the trial court abused its discretion in concluding that Boren presented adequate evidence of levels of exposure.

As noted, Burlington's brief on appeal is concerned primarily with arguing that Boren needed to present more evidence of the specific chemicals and the specific dose or levels to which he was exposed. Burlington does not argue in what other fashion the experts' testimony fails the general test of admissibility for expert testimony set forth above. We find no merit to either of Burlington's grounds for arguing the opinions were inadmissible.

### (b) Summary Judgment

Burlington assigns as error that the court should not have received Dr. Donovan's affidavit at the first summary judgment hearing. Burlington also assigns as error that there was no admissible evidence to prove medical causation at the second summary judgment hearing. To the extent these assigned errors

assert that the medical testimony was inadmissible, they are not argued except as set forth above. For the reasons previously discussed, these assigned errors are without merit. To the extent Burlington assigns that the opinions were inadmissible at the summary judgment hearing on any other grounds, Burlington has failed to adequately argue the issue. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Mondelli v. Kendel Homes Corp.*, 262 Neb. 263, 631 N.W.2d 846 (2001); *Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678, 605 N.W.2d 136 (2000); *Richardson v. Anderson*, 8 Neb. App. 923, 604 N.W.2d 427 (2000). As such, we will not further discuss this assignment of error.

### (c) Motion in Limine

Burlington assigns as error that the court erred in denying Burlington's motion in limine to preclude the testimony of Boren's experts. Burlington does not argue this assigned error, except to the extent Burlington has argued that the various medical opinions were generally inadmissible as discussed above. For the reasons stated above, this assigned error is without merit. To the extent Burlington assigns the motion should have been sustained or that the opinions were inadmissible on grounds other than those discussed above, Burlington has failed to adequately argue the issue, and we will not further address it. See *id.*

### (d) Trial

Burlington also asserts that the trial court erred in allowing the various experts to testify at trial. As discussed above, we conclude that the trial court did not abuse its discretion in ruling that the expert opinions were admissible. This assigned error is without merit.

### 3. MSDS

Burlington next asserts that the trial court erred in receiving MSDS into evidence. Burlington assigns the admission of these documents at both the first summary judgment hearing and at trial. We find the court did not abuse its discretion in receiving the documents.

## (a) Admissibility in General

On appeal, Burlington asserts that the specific contents of various chemicals Boren claims to have been exposed to were uncertain because the evidence at trial indicated that the MSDS for 6-66 (aerosol) and Safety-Kleen that were received at trial were dated after Boren allegedly used the products. Because MSDS were not available from the specific dates during which Boren was using the products, Burlington asserts that the specific chemical makeup of the products during the time of Boren's alleged exposure is unknown. The last product for which an MSDS was received that Burlington discusses in its brief on appeal is Part-Ease liquid graphite, which Burlington asserts "no one testified to using." Brief for appellant at 38. The sum total of Burlington's argument in the brief on appeal concerning the admissibility of all these MSDS is as follows: "These MSDS were irrelevant and [Burlington's] initial objections to receipt and motions to strike these MSDS, and the others for which no relevancy was shown, constitutes prejudicial error." *Id.*

The various MSDS were initially received over objections on foundation, relevance, and hearsay. The MSDS were demonstrated to have been business records routinely kept in the course of Burlington's business, and it was demonstrated that the documents were retrieved from Burlington's premises through the discovery process. As noted, the only objection that Burlington has raised on appeal concerns the relevancy of the MSDS for 6-66 (aerosol), Safety-Kleen, and Part-Ease liquid graphite.

Boren testified that when working at both Gibson and Havelock, he used an aerosol product to loosen bolts. According to Boren, the aerosol was sprayed onto various bolts to loosen them when they could not be cut off railcars and had to be removed with a wrench. Boren testified that the product said "something about 666 on it." The MSDS which was located at Burlington's offices was for an aerosol product called 6-66 (aerosol). The MSDS for 6-66 (aerosol) was dated June 1988 and indicated that the product contained, among other chemicals, petroleum distillate and 1,1,1-trichloroethane. One of Boren's experts, Dr. Ellenbecker, an industrial hygienist, testified that he had seen another MSDS for 6-66 (aerosol) that indicated the product did not contain 1,1,1-trichloroethane. Dr. Ellenbecker testified

that the version which did not contain 1,1,1-trichloroethane had an increased amount of petroleum distillate.

Boren testified that when cleaning journals at Gibson, the solvent used was called "Stay-Kleen or something like that." Burlington's counsel conceded to the court at trial that "Stay-Kleen" and Safety-Kleen were presumed to be the same thing. Other employees testified to using mineral spirits to clean the journals. The MSDS received at trial indicate that mineral spirits, petroleum distillates, Stoddard solvent, and Safety-Kleen are all synonymous terms. The MSDS indicate that Safety-Kleen contains, among other chemicals, toluene, xylene, and 1,1,1-trichloroethane. Dr. Frank testified that these various chemicals are "well known for their ability and propensity to cause liver damage." The MSDS for Safety-Kleen is dated March 1990.

Finally, Boren testified to using a liquid graphite product to loosen couplers that connected the railcars. In cross-examining Dr. Donovan, Burlington's counsel referred specifically to Part-Ease. The MSDS for Part-Ease located at Burlington's offices indicates that it is a "[b]lack liquid aerosol." The colloquy between the attorneys and the court during trial indicates that Part-Ease was the only liquid graphite product for which an MSDS was found at Burlington's offices.

Burlington's primary argument appears to be that these MSDS were not relevant either because they were dated at a time after Boren's alleged exposure or because they indicate a product in an aerosol form instead of a liquid form, as Boren testified he used. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995). The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding it will not be reversed absent an abuse of discretion. *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001). In the present case, Dr. Ellenbecker testified that although he had not seen the MSDS from the specific times at which Boren alleged exposure, there would not likely be any significant difference, and that even with slight variations in chemical composition, the various products would still be comparable organic solvents. Burlington's

counsel cross-examined each of Boren's expert witnesses concerning the MSDS and the difference in dates, and the court specifically noted in ruling on Burlington's motion for directed verdict that the court was not going to limit Burlington's counsel's argument on the issue to the jury. On the basis of the entire record presented on appeal, we do not find an abuse of discretion by the trial court in finding the MSDS at issue were relevant.

### (b) Summary Judgment

According to Burlington's brief on appeal, the MSDS concerning Part-Ease was not at issue at the hearing on Burlington's first motion for summary judgment. As such, the only assignment of error remaining concerning the MSDS and the first motion for summary judgment is whether the court erred in receiving the MSDS concerning 6-66 (aerosol) and Safety-Kleen. For the reasons stated above, the court did not commit an abuse of discretion in concluding that the MSDS were relevant. This assigned error is, therefore, without merit.

### (c) Trial

Burlington also assigns as error that the trial court erred in receiving the MSDS at issue at trial. As noted above, the record before us indicates that the court did not abuse its discretion in concluding that the MSDS were relevant and that the remaining questions concerning their accuracy were matters of fact for the jury to decide. As such, this assignment of error is also without merit.

### 4. MOTIONS FOR SUMMARY JUDGMENT

Burlington has assigned as error that the trial court erred in overruling both the first and second motions for summary judgment filed by Burlington. The argument in Burlington's brief on appeal regarding these issues is confined to whether the court erred in admitting the expert medical testimony discussed above and whether the court erred in admitting the MSDS discussed above. Inasmuch as we have already concluded that there was no error in the court's rulings receiving such evidence, there is likewise no merit to Burlington's argument that the motions for summary judgment were erroneously denied.

### 5. MOTION IN LIMINE REGARDING CHEMICALS

Burlington filed a motion in limine on February 25, 2000, and another on March 22, both of which appear to be substantially identical. The court overruled the motion on March 28. On appeal, Burlington has assigned as error the court's ruling "denying [Burlington's] motion in limine to preclude [Boren] from testifying about chemicals that did not provide a basis for any medical opinion."

Our review of Burlington's brief on appeal indicates no argument or indication whatsoever that Boren did, in fact, testify about any chemicals that did not provide a basis for the opinions of the medical experts. We have previously discussed the chemicals that Boren testified about, and all of them were discussed in the course of the medical experts' testimony concerning their opinions. As such, on the record and briefs before us, we find no merit to this assignment of error.

### 6. MEDICAL TREATISE

Burlington next assigns as error that "[t]he court erred in allowing a portion of a medical treatise to be read into evidence without a showing of reliability." However, a review of Burlington's brief on appeal reveals no argument concerning this issue. As such, without further guidance we are left to try to discern where, in the course of over 1,100 pages of testimony, this alleged error occurred. Alleged errors that are not both assigned and argued in the brief on appeal will not be considered by this court. See, *Mondelli v. Kendel Homes Corp.*, 262 Neb. 263, 631 N.W.2d 846 (2001); *Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678, 605 N.W.2d 136 (2000); *Richardson v. Anderson*, 8 Neb. App. 923, 604 N.W.2d 427 (2000). As such, we will not further discuss this alleged error.

### 7. JURY INSTRUCTIONS

Burlington has assigned as error that the court erred in instructing the jury that a violation of Occupational Safety and Health Administration (OSHA) regulations constitutes negligence per se and in instructing the jury that it could award damages for the loss of earning capacity and loss of household services. We find this assignment of error to be without merit in both respects.

 Whether jury instructions given by a trial court are correct is a question of law. *State v. Johnson*, 261 Neb. 1001, 627 N.W.2d 753 (2001); *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001); *State v. Wright*, 261 Neb. 277, 622 N.W.2d 676 (2001). In an appeal based on a claim of erroneous jury instructions, the appellant has the burden to show that the questioned instructions were prejudicial or otherwise adversely affected a substantial right of the appellant. *Id.*; *Everts v. Hardcopf-Bickley*, 257 Neb. 151, 595 N.W.2d 911 (1999).

### (a) Negligence Per Se

The negligence per se instruction given by the trial court was jury instruction No. 9. The instruction instructed the jury that evidence had been received with respect to OSHA rules and regulations and that if the jury were to find that Burlington violated any of the OSHA standards and that such violation contributed to Boren's injuries, then the jury was to return a verdict for Boren. The instruction then indicated that the jury was to "go to Instruction No. 23 and verdict form #2 and determine [Boren's] damages." The transcript presented on appeal, however, includes an affidavit of the trial judge indicating that verdict form No. 2 was not filled out by the jury. In addition, the transcript presented on appeal clearly indicates that the jury instead filled out verdict form No. 1.

As noted, Burlington bears the burden on appeal of demonstrating that the given instruction somehow caused prejudice. Inasmuch as the jury did not make a finding in accordance with the complained of instruction, Burlington has failed to meet this burden on appeal. This assigned error is without merit.

### (b) Damages

Instruction No. 23 given by the trial court instructed the jury concerning what factors could be considered by the jury in assessing the amount of damages to award. Specifically, the instruction included that the jury could consider the reasonable value of household services which Boren has been unable to perform for himself to date and the present value of household services Boren is reasonably certain to be unable to perform for himself in the future. The instruction also included that the jury

could consider the reasonable value of the loss of earning capacity suffered by Boren.

### (i) Household Services

Burlington challenges the portion of the jury instruction No. 23 which instructed the jury that damages could be awarded for the reasonable value of household services which Boren has been or will be unable to perform for himself. Burlington asserts that there was no evidence that Boren cannot perform any household services for himself and that there is no evidence of what the value of any such loss should be.

Boren testified that on a day-to-day basis, his activity level is now "[a]bout half of what [he] used to do." He testified that he cannot "necessarily" do things around the house or do any outside work. He confirmed that he has suffered memory losses. Additionally, both Boren and his wife testified to his inability to perform household services related to the care of their profoundly disabled son. Boren's wife confirmed that Boren "sleeps the majority of the time that he's home."

On the record before us, there was sufficient evidence presented for the court to give the challenged instruction. Both Boren and his wife testified concerning his inability to help out with household chores, specifically caring for their profoundly disabled son. To allow recovery for Boren's inability to perform these household chores is not, as Burlington asserts, allowing an improper award for loss of consortium. Compare *Anderson v. Burlington Northern, Inc.*, 469 F.2d 288 (10th Cir. 1972) (holding that FELA does not permit loss of consortium damages). The instruction did not allow the jury to award damages suffered by Boren's wife or children on account of his injury, but limited the permissible scope of damages to the reasonable value of Boren's loss of ability to perform household chores for himself. This assigned error is without merit.

### (ii) Earning Capacity

Burlington further challenges the portion of the jury instruction which instructed the jury that damages could be awarded for any loss of earning capacity suffered by Boren. Burlington argues that the instruction was not warranted because there was

no medical evidence that Boren was disabled or had any restrictions. We do not believe that such evidence is a prerequisite to an instruction on lost earning capacity in Nebraska.

Damages for permanent impairment of future earning capacity may not be based on speculation, probabilities, or uncertainty, but must be shown by competent evidence that such damages are reasonably certain as the proximate result of the pleaded injury. *Uryasz v. Archbishop Bergan Mercy Hosp.*, 230 Neb. 323, 431 N.W.2d 617 (1988). Impairment of earning capacity is an item of general damage, and proof may be had under general allegations of injury and damage. *Chirnside v. Lincoln Tel. & Tel. Co.*, 224 Neb. 784, 401 N.W.2d 489 (1987). There is no fixed rule for determining the amount of compensation for damages for impairment of future earning capacity, except as may be fair and reasonable under the circumstances. *Uryasz v. Archbishop Bergan Mercy Hosp., supra.* Such recovery for loss may be based upon such factors as the plaintiff's age, life expectancy, health, habits, occupation, talents, skill, experience, training, and industry. *Id.*; *Chirnside v. Lincoln Tel. & Tel. Co., supra.* It is within the province of the jury to weigh all these elements and, guided by experience and common sense, to arrive at the proper monetary value of the plaintiff's loss without recourse to his or her past earnings. *Chirnside v. Lincoln Tel. & Tel. Co., supra.*

In the present case, both Boren and his wife testified about his general health and habits since his hospitalization in 1993. Boren testified that after recovering from surgery, he returned to work on a different shift from the one he had previously worked, that he took a different shift to be working away from the chemicals, and that he generally suffers fatigue that he did not suffer prior to his hospitalization. Boren's physician, Dr. Donovan, testified that the scarring of Boren's liver is permanent and that as a result of his medical condition, he will continue to suffer "tremendous fatigue." The jury had specific evidence concerning Boren's age, life expectancy, health, habits, occupation, talents, skill, experience, training, and the railroad industry. From our review of the record, there was ample evidence to sustain the court's decision to instruct the jury on potential loss of earning capacity. This assigned error is without merit.

## 8. Remaining Motions

Finally, Burlington has assigned that the trial court erred in denying Burlington's motions for directed verdict and judgment notwithstanding the verdict "for the reason that there was no admissible evidence of defendant's negligence or causation." Additionally, Burlington assigns that the trial court erred in not granting a new trial to correct the various other errors complained of.

Our review of Burlington's brief on appeal reveals that there is no argument concerning any of these issues, except to the extent Burlington's argument asserts that the court erred in receiving expert testimony and the MSDS as discussed above. Inasmuch as we have already concluded that those assignments of error are without merit, we likewise find no merit to this assignment of error.

## V. CONCLUSION

In this appeal, Burlington has assigned numerous errors concerning the admissibility of evidence proffered by Boren concerning chemicals he was exposed to while employed at Burlington and the causal connection between those chemicals and his subsequent development of cirrhosis of the liver. For the reasons stated herein, we find no merit to Burlington's assertions of error. Additionally, we find no merit to Burlington's assertions that the court erred in instructing the jury. For these reasons, we affirm.

AFFIRMED.