NORA J. EPP, APPELLANT, V. MARK E. LAUBY, APPELLEE.

715 N.W.2d 501

Filed June 2, 2006.    No. S-04-990.

John M. Lefler for appellant.

William E. Gast, P.C., L.L.O., and Michael D. McClellan, of Nelson McClellan, for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## I. NATURE OF CASE

Nora J. Epp brought the present action for damages allegedly sustained in a motor vehicle accident. Among other injuries, Epp claimed that she developed fibromyalgia and depression as a proximate result of the accident and sought to present expert testimony at trial substantiating that claim. Epp also sought to present expert testimony regarding the loss of earnings and loss of earning capacity she allegedly suffered as a proximate result of the accident. The trial court conducted a *Daubert* hearing with regard to Epp's expert testimony that her fibromyalgia was caused by the accident. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). After the hearing, the trial court specifically excluded such evidence and, based on its *Daubert* ruling, it also excluded expert testimony regarding Epp's alleged loss of earnings and loss of earning capacity. Following a jury verdict on the amount of damages, Epp filed a motion for new trial based on, inter alia, the exclusion of the expert testimony. Epp's motion was denied, and she appeals.

## II. BACKGROUND

In June 1999, Epp was involved in a three-vehicle collision, wherein Epp's vehicle was struck from the rear by an automobile driven by Brad A. Webb, whose vehicle was struck from the rear by a vehicle driven by Mark E. Lauby. In July, Epp began treating with Dr. Lane Handke for tissue spasms in her neck and a tingling sensation in her left arm and leg that she experienced after the accident. Handke initially diagnosed Epp with a cervical strain, thoracic sprain, lumbar sprain, and a history of asthma. In

followup visits, Handke also determined that Epp was suffering from high personal stressors and major depression.

In January 2000, Epp suffered a severe asthma attack which required hospitalization. In February, Epp sought treatment from Handke for constant, severe headaches and radiating pain down her left arm. Handke testified by deposition that this was the first time Epp had complained of headaches. He further testified that he found myofascial trigger points at the base of Epp's skull, base of her neck, and interscapular area. Based on Epp's symptomatology, Handke diagnosed Epp with chronic sinusitis, chronic neck pain with left arm radicular symptoms, and tension headaches. He testified, however, that he also considered at that time fibromyalgia as a possible diagnosis. Thereafter, in March, Epp was diagnosed by Handke with fibromyalgia. Fibromyalgia is described as

> a syndrome of widespread pain, decreased pain threshold, and characteristic symptoms, including non-restorative sleep, fatigue, stiffness, mood disturbance, irritable bowel syndrome, headache, paresthesias, and other less common features. Widespread pain has generally been defined by the number of body regions involved . . . or by a pattern of pain complaint that involves both sides of the body, upper and lower body, and axial skeleton. Decreased pain threshold (tenderness) is indicated by the proportion of specific sites that elicit complaints of pain on palpation.

Frederick Wolfe et al., *The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability*, 23 J. Rheumatology 534 (1996). In his deposition, Handke testified that Epp suffered from the following symptoms of fibromyalgia: chronic fatigue, irritable bowel syndrome, intermittent tension headaches, insomnia, and paired trigger points in the head and back.

### III. PROCEDURAL HISTORY

Epp sued Lauby and Webb for damages allegedly sustained in the accident. Among other injuries, Epp sought to recover damages for fibromyalgia and depression, which she claimed developed as a result of the accident. Epp also sought to recover for loss of earnings and loss of earning capacity.

Epp designated Handke as an expert to testify that the accident was the proximate cause of her fibromyalgia and depression. Epp also designated as expert witnesses Alfred J. Marchisio, Jr., M.S., and David I. Rosenbaum, Ph.D. Marchisio, a vocational rehabilitation counselor, was identified by Epp to testify that she sustained a complete loss of earning capacity as a proximate result of the automobile accident. Rosenbaum, an economist, was identified by Epp to testify regarding the loss of earnings and loss of earning capacity Epp alleged she suffered as a result of the accident. The opinions of Marchisio and Rosenbaum were premised in part on the assumption that Epp's fibromyalgia and depression were directly related to her accident.

Lauby filed a motion in limine to exclude the testimony of Handke as it related to the causation of Epp's fibromyalgia and depression. Lauby alleged in his motion that the reasoning and methodology underlying Handke's opinions that Epp's fibromyalgia and depression were caused by the accident have not been tested or validated in the medical scientific community and could not be properly applied to the facts of the case. Lauby also filed a motion in limine to exclude the testimony of Marchisio and Rosenbaum. With regard to Marchisio's testimony, Lauby argued that there was no reliable medical expert opinion that Epp suffered permanent impairment as a result of the injuries she suffered in the accident. With regard to Rosenbaum's testimony, Lauby argued that there was no medical opinion available to tie Epp's loss of earning capacity to the injuries she allegedly suffered in the accident.

A *Daubert* hearing was scheduled regarding the testimony of Handke, and the trial court granted Epp 30 days to name another physician as an expert witness. Pursuant to the court's order, Epp identified Dr. Robert M. Bennett as an additional expert regarding the relationship between physical trauma and fibromyalgia. At the *Daubert* hearing, the deposition of Handke was admitted into evidence, as well as a number of medical articles and cases discussing the causation of fibromyalgia. Following the *Daubert* hearing, Lauby filed with the trial court a motion captioned "Motion to Exclude Expert Testimony of Dr. Bennett in Plaintiff's Case in Chief and Motion in Limine to Exclude

Opinion Testimony of Dr. Bennett Related to Fibromyalgia."
Lauby argued that the testimony of Bennett should be excluded
to the extent it suggested a causal relationship between Epp's
fibromyalgia and the accident.

The trial court entered an order granting Lauby's motion in
limine as to the testimony of Handke and Bennett as it related to
the causal connection between physical trauma and the onset
of fibromyalgia. In its order, the court referenced a number of
studies and cases discussing the causal relationship between
trauma and fibromyalgia and concluded that at the current time,
medical science did not link trauma to fibromyalgia. Epp filed
an amended motion for reconsideration and a renewal of her
amended motion for reconsideration, which were overruled.

Prior to trial, the court granted Lauby's motion in limine with
regard to the testimony of Marchisio and Rosenbaum. From the
record, it appears that the motion in limine was granted with
regard to Marchisio and Rosenbaum because Epp's fibromyal-
gia was not causally connected to the accident in this case. The
court also granted summary judgment in favor of Webb, and lia-
bility was admitted by Lauby.

A jury trial was held on the nature and extent of damages
sustained by Epp as a result of the accident. At trial, Epp made
an offer of proof with regard to the evidence which was
excluded by the court's November 10, 2003, *Daubert* ruling.
Encompassed in Epp's offer of proof was testimony by Handke,
outside the presence of the jury, that Epp suffers from fibro-
myalgia as a result of the accident and that Epp's depression
was a complex symptom of her fibromyalgia. Epp also made an
offer of proof with regard to the testimony of Marchisio and
Rosenbaum, which Epp stated would have been presented
absent the court's *Daubert* ruling on the testimony of Handke
and Bennett.

A verdict was returned in Epp's favor in the amount of
$36,410. Thereafter, Epp filed a motion for new trial on the
ground that the trial court erred, inter alia, in granting Lauby's
motions in limine with regard to the testimony of Handke,
Bennett, Marchisio, and Rosenbaum. The motion was overruled,
and Epp filed the present appeal.

## IV. ASSIGNMENTS OF ERROR

Epp assigns that the trial court erred in (1) refusing to allow Handke and Bennett to testify that the accident was the proximate cause of Epp's fibromyalgia; (2) refusing to allow Handke and Bennett to testify that the accident was the proximate cause of Epp's depression; (3) refusing to allow Jeffrey Creal, a physical therapist, to testify that Epp sustained a functional capacity loss, physical restrictions, and work restrictions as a proximate result of the accident; (4) refusing to allow Marchisio to testify that Epp suffered a total loss of earning capacity as a proximate result of the accident; and (5) refusing to allow Rosenbaum to testify regarding the amount of past lost earnings Epp suffered as a result of the accident and the value of her loss of earning capacity.

Epp failed to argue her second assignment of error in her brief on appeal. Therefore, we will not address it on appeal. See *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005) (errors that are assigned but not argued will not be addressed by appellate court).

## V. STANDARD OF REVIEW

A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Kant v. Altayar*, 270 Neb. 501, 704 N.W.2d 537 (2005).

In proceedings where the Nebraska rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility. *In re Estate of Jeffrey B.*, 268 Neb. 761, 688 N.W.2d 135 (2004). Generally, a trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Hartman v. Hartman*, 265 Neb. 515, 657 N.W.2d 646 (2003); *Ford v. Estate of Clinton*, 265 Neb. 285, 656 N.W.2d 606 (2003).

## VI. ANALYSIS

### 1. Exclusion of Expert Testimony Regarding Fibromyalgia Causation

Epp alleges that as a result of the automobile accident, she developed fibromyalgia. To establish the causal connection at trial, Epp sought to present the expert testimony of Handke and Bennett. Following a *Daubert* hearing on the matter, the trial court granted Lauby's motion in limine excluding their testimony on the ground that the theory underlying their opinions, i.e., that physical trauma can cause fibromyalgia, "lack[s] scientific support." On appeal, Epp contends the trial court erred when it excluded the opinion testimony of Handke and Bennett regarding the causation of her fibromyalgia.

Before entering into our analysis, we note that we are not deciding whether Epp suffers from symptoms of fibromyalgia. There appears to be no dispute that she does. We are also not deciding as a general proposition whether trauma can cause fibromyalgia. Rather, under our abuse of discretion standard, we are deciding whether there was sufficient evidence presented to allow Epp's experts, Handke and Bennett, to opine that physical trauma was the cause of Epp's fibromyalgia.

Under our recent *Daubert/Schafersman* jurisprudence, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). See, also, *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005). Most recently, we described a trial court's evaluation of the admissibility of expert testimony as essentially a four-step process. *State v. Mason, ante* p. 16, 709 N.W.2d 638 (2006). First, the court must determine whether the witness is qualified to testify as an expert. If the expert is and it is necessary for the court to conduct a *Daubert* analysis, the court must next determine whether the reasoning or methodology underlying the expert testimony is scientifically valid and reliable. Once the reasoning or methodology has been found to be reliable, the court must next determine whether the methodology was properly applied to the facts in issue. Finally, the court determines whether the evidence and opinions related thereto

are more probative than prejudicial, as required under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995). *State v. Mason, supra.*

The expert qualifications of Handke and Bennett are not at issue. Consequently, we must determine whether the testimony of Handke and Bennett was otherwise admissible under our *Daubert/Schafersman* framework. Based upon our review of the evidence before the trial court, we conclude that the trial court's determination that the testimony was not admissible was an abuse of discretion.

(a) Admissibility of Handke's Testimony

Handke concluded that Epp's fibromyalgia was caused by the physical trauma of the accident after conducting a differential diagnosis.

In *Carlson v. Okerstrom,* 267 Neb. 397, 675 N.W.2d 89 (2004), we addressed the reliability of a differential diagnosis. We stated that differential diagnosis is a technique which generally has widespread acceptance in the medical community, has been subjected to peer review, and does not frequently lead to incorrect results. We emphasized, however, that an expert's opinion is not admissible simply because he or she conducted a differential diagnosis. To the contrary, in order for an expert's opinion to be reliable, the court must determine whether the expert conducted a *reliable* differential diagnosis. *Id.*

In *Carlson,* we set forth a two-step process for determining whether an expert conducted a reliable differential diagnosis.

> The first step in conducting a reliable differential diagnosis is to "compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." . . . If the expert "rules in" a potential cause that is not capable of causing the patient's symptoms, the expert's opinion is of questionable reliability. . . . Similarly, if the expert *completely* fails to consider a cause that could explain the patient's symptoms, the differential diagnosis is not reliable. . . .
>
> Once the expert has ruled in all plausible causes for the patient's condition, the next step is to "engage in a process of elimination, eliminating hypotheses on the basis of a

> continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case." . . . In analyzing the second step of a differential diagnosis under the *Daubert/Schafersman* framework, the question is whether the expert had a reasonable basis for concluding that one of the plausible causative agents was the most likely culprit for the patient's symptoms. In other words, the expert must be able to show good grounds for eliminating other potential hypotheses.

(Citations omitted.) (Emphasis in original.) *Id.* at 414, 675 N.W.2d at 105-06.

In *Carlson*, the parties did not dispute that trauma was capable of causing the condition suffered by the plaintiff or whether the expert had properly ruled in potential causes of the plaintiff's injury. It was therefore unnecessary for us to determine whether the first step of the differential diagnosis was properly performed. Here, however, Epp's appeal concerns whether trauma can be a possible cause of fibromyalgia. We must therefore determine whether Handke properly ruled in trauma as a potential cause of Epp's fibromyalgia.

■ We have noted with approval nonexclusive criteria which the trial court may consider in evaluating the reliability of a particular theory. These include (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within the relevant scientific community. See, *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004); *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). These are, however, neither exclusive nor binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances. *Id.*

The trial court was presented with voluminous materials to assist it in its determination of whether the theory underlying the opinions of Handke and Bennett was reliable. A review of these materials reveals the existence of a professional controversy regarding the causal relationship between physical trauma and

fibromyalgia. A number of experts in the field of fibromyalgia believe that an association exists between physical trauma and the onset of fibromyalgia. See, e.g., A.W. Al-Allaf et al., *A Case-Control Study Examining the Role of Physical Trauma in the Onset of Fibromyalgia Syndrome*, 41 Rheumatology 450 (2002) (suggesting association between physical trauma and onset of fibromyalgia); Robert M. Bennett, *A Multidisciplinary Approach to Treating Fibromyalgia*, in Progress in Fibromyalgia and Myofascial Pain 393 (H. Vaeroy & H. Merskey eds., 1993) (stating musculoskeletal pain experienced by fibromyalgia patients arises as result of microtrauma); Dan Buskila et al., *Increased Rates of Fibromyalgia Following Cervical Spine Injury*, 40 Arthritis & Rheumatism 446 (1997) (noting association between diagnosis of fibromyalgia and cervical spine injury); Stuart Greenfield et al., *Reactive Fibromyalgia Syndrome*, 35 Arthritis & Rheumatism 678 (1992) (explaining that study to determine frequency of precipitating event occurring prior to onset of fibromyalgia revealed that 23 percent of patients with primary rheumatologic diagnosis of fibromyalgia reported having trauma, surgery, or other medical illness before onset of fibromyalgia); George W. Waylonis et al., *A Profile of Fibromyalgia in Occupational Environments*, 73 Am. J. Phys. Med. Rehab. 112 (1994) (noting association between onset of fibromyalgia symptoms and traumatic event); Muhammad B. Yunus et al., *Fibromyalgia Consensus Report: Additional Comments*, 3 J. Clinical Rheumatology 324, 325 (1997) (stating that "[i]n the context of a legal setting (where the Consensus Report is likely to be used), causality entails only 51% certainty . . . it seems more than 51% likely that trauma does play a causative role in some [fibromyalgia] patients"). This view is also held by Handke and Bennett, and was conceded by Lauby's expert, who stated that physical trauma may be a precipitating cause of fibromyalgia, though at present there is no way to determine the cause of fibromyalgia outside the clinical setting.

Other experts, however, believe that the connection has not been sufficiently established and that additional studies are needed to confirm it. See, e.g., Al-Allaf et al., *supra* (concluding that further studies are needed to confirm association between trauma and fibromyalgia and to determine whether trauma has

causal role); Buskila et al., *supra* (noting that data from literature is insufficient to indicate whether causal relationships exist between trauma and fibromyalgia); Frederick Wolfe et al., *The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability*, 23 J. Rheumatology 534 (1996) (noting that epidemiologic studies of trauma and fibromyalgia needed to address potential or predictive causality are currently not available).

After reviewing the evidence and applying the *Daubert/ Schafersman* standards, the trial court found that the theory of a causal link between physical trauma and fibromyalgia has not been verified by sufficient testing, has not been subject to peer review, and does not enjoy general acceptance within the medical community. Consequently, the court excluded Handke's testimony on the cause of Epp's fibromyalgia. Upon our review, we determine that the court abused its discretion by excluding Handke's testimony.

Although important, general acceptance of the causal link between physical trauma and fibromyalgia is not determinative of the admissibility of expert testimony under *Daubert/Schafersman* standards. See *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004). So long as the expert's opinion is based on reliable methodology, his or her opinion is admissible, whether or not the court agrees with the expert's conclusion. *Reichert v. Phipps*, 84 P.3d 353 (Wyo. 2004). In the instant case, Handke arrived at the conclusion that Epp's fibromyalgia was caused by physical trauma after conducting a reliable differential diagnosis, as we will determine later in this opinion. Handke's conclusion is supported by medical literature in evidence which supports the theory that fibromyalgia may be caused by physical trauma.

The *Daubert* test does not stand for the proposition that scientific knowledge must be absolute or irrefutable. See *State v. Dahood*, 148 N.H. 723, 814 A.2d 159 (2002). "[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). While a theory or technique that has attracted only " 'minimal support' " within the relevant scientific community "may properly be viewed with skepticism," a reliability assessment does not

require an express determination of a particular degree of acceptance within the scientific community. See 509 U.S. at 594. Thus,

"'[c]ontroversy within the scientific community is not necessarily a ground for exclusion of scientific evidence. In deciding whether to admit scientific evidence, a court need not resolve disputes between reputable experts; the evidence may be admissible even though a dispute exists. . . . [T]he witness who testifies to an expert opinion is subject to cross-examination concerning how he or she arrived at that opinion, and . . . in eliciting testimony to vitiate the opinion.'"

*State v. Sampson*, 167 Or. App. 489, 502-03, 6 P.3d 543, 553 (2000), quoting *State v. Lyons*, 324 Or. 256, 924 P.2d 802 (1996).

Although the issue is disputed, there is support in the medical literature for the theory that physical trauma can cause fibromyalgia. That support, while controverted, is the result of peer-reviewed research conducted pursuant to appropriate methods of scientific inquiry. While there is not a sufficient scientific consensus to say that the theory is generally accepted, nor has a rate of error been established, the theory that trauma can cause fibromyalgia has been the subject of empirical research, the results of which have been subjected to peer review and publication. See *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra.* We cannot conclude that Handke and Bennett's reliance on this research, instead of literature to the contrary, was methodologically unreliable. If proffered scientific evidence rests on sound scientific reasoning or methodology and properly can be applied to the facts in issue, it meets the *Daubert* requirements for admissibility, even if the conclusion is novel or controversial. See *State v. Dahood, supra.* Despite the existence of "spirited dissent," see *State v. Sampson*, 167 Or. App. at 503, 6 P.3d at 553, the lack of a scientific consensus on the link between trauma and fibromyalgia was not sufficient to render reliance upon that literature methodologically unreliable. We, therefore, conclude that the evidence was sufficient to support the theory of a causal relationship between physical trauma and fibromyalgia and that the trial court abused its discretion in concluding otherwise.

Having determined that Handke properly ruled in physical trauma as a cause of Epp's fibromyalgia, we must next determine whether Handke properly ruled in and ruled out other causes.

Because there appears to be no disagreement between the parties regarding whether Handke properly ruled in other potential causes of Epp's fibromyalgia, we determine that Handke correctly conducted the first part of his differential diagnosis. We similarly conclude that Handke properly ruled out other potential causes of Epp's fibromyalgia. Handke testified that known causes of fibromyalgia include trauma, infection, stress, idiopathy, chronic pain diagnosis, and diseases such as degenerative arthritis and rheumatoid arthritis. Handke further testified that he eliminated causes other than trauma. Handke based this elimination upon repeated clinical examinations; the fact that Epp did not suffer from any of the other known causes of fibromyalgia prior to the accident, and soon thereafter developed symptoms of fibromyalgia. Ruling out decisions based on the results of physical examinations provides a well-accepted diagnostic technique which generally provides a valid basis for discarding hypotheses during the "ruling out" portion of a differential diagnosis. See *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004). Under these circumstances, we cannot say that Handke's differential diagnosis was unreliable. Consequently, we conclude that the trial court abused its discretion in not allowing the jury to determine the weight given to Handke's opinion testimony on the cause of Epp's fibromyalgia.

### (b) Admissibility of Bennett's Testimony

Bennett's opinion that Epp's fibromyalgia was caused by the accident was based upon Bennett's own extensive experience in the field of rheumatological conditions, including fibromyalgia, Epp's self-reported symptoms, a physical examination of Epp, and a review of Epp's extensive medical records.

Having already determined that the trial court's basis for excluding Handke's testimony on the causation of Epp's fibromyalgia was an abuse of discretion, we conclude that under the circumstances presented in the instant case, Bennett's testimony was reliable and the trial court's exclusion of Bennett's testimony was also an abuse of discretion.

### 2. REMAINING ASSIGNMENTS OF ERROR

In her final assignments of error, Epp contends that the testimony of Creal, Marchisio, and Rosenbaum was improperly

excluded because their opinions were predicated on Epp's fibromyalgia. As we read the record, the testimony of these witnesses was excluded as a result of the trial court's exclusion of Handke's and Bennett's opinion testimony causally relating Epp's fibromyalgia to the accident. Because we have determined that the trial court's rationale for excluding this testimony was erroneous, we remand for further consideration the question of the admissibility of this testimony, which question goes to the issue of damages only.

## VII. CONCLUSION

Liability in this case was admitted, and it is not affected by our disposition of this appeal. We affirm the district court's judgment to that extent, and remand the cause for a new trial to be limited to the issue of damages.

REVERSED AND REMANDED.

WRIGHT, J., participating on briefs.