16 Neb. App. 544
VICKI KING, SPECIAL ADMINISTRATRIX OF THE ESTATE OF BRADLEY B. KING, DECEASED, APPELLANT,
v.
BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, A DELAWARE CORPORATION, APPELLEE.
No. A-05-1520.
Court of Appeals of Nebraska.
Filed March 11, 2008.
Richard J. Dinsmore and Jayson D. Nelson, of Law Offices of Richard J. Dinsmore, P.C., for appellant.
Nichole S. Bogen and James A. Snowden, of Wolfe, Snowden, Hurd, Luers & Ahl, L.L.P., for appellee.
IRWIN, SIEVERS, and MOORE, Judges.
MOORE, Judge.

INTRODUCTION
This is a Federal Employers' Liability Act (FELA) case brought in the district court for Douglas County in which Bradley B. King claimed that he contracted multiple myeloma due to his exposure to diesel exhaust during his 28-year employment with the Burlington Northern and Santa Fe Railway Company (BNSF). King died on April 9, 2002, and the matter was revived in the name of his wife, Vicki King, the administratrix of his estate. For the sake of simplicity, we hereinafter refer to Vicki King also as "King." The district court granted BNSF's motion in limine, excluding King's expert witness from testifying, and subsequently granted summary judgment in favor of BNSF. Because we find no abuse of discretion in the district court's rulings, we affirm.

BACKGROUND
King brought an action against BNSF under the FELA, 45 U.S.C. § 51 et seq. (2000), and the Locomotive Inspection Act, now codified at 49 U.S.C. § 20701 et seq. (2000). King alleged that he contracted multiple myeloma because of his exposure to diesel exhaust fumes while working for BNSF for 28 years. Multiple myeloma is a cancer affecting the plasma cell, and according to the Multiple Myeloma Research Foundation, although multiple myeloma is treatable, it is an incurable disease. See, generally, Multiple Myeloma Research Foundation, About Myeloma, http://www.multiplemyeloma.org/ about_myeloma/index.php (last visited Jan. 2, 2008). In his first amended petition, King sought judgment against BNSF on his first and second causes of action for present special damages of $128,000, future special damages, any and all general damages allowed by law, and costs.
On June 22, 2005, BNSF filed a motion in limine and for summary judgment. BNSF sought exclusion of King's expert witness, Dr. Arthur Frank, alleging that Frank was unqualified to render an opinion as to the cause of King's multiple myeloma because his opinion was based on subjective beliefs and unsupported speculation without basis in scientific standards and was based on insufficient facts or data in contravention of the standard for admissibility of expert testimony.
At the hearing on BNSF's motion in limine, the district court received various exhibits, including two depositions of King, a deposition of Frank, a deposition of BNSF's expert, and numerous medical articles relied on by the parties' experts. Because the depositions, as well as the medical literature, relied on by the parties are quite voluminous, we only set forth the general arguments presented to the district court in this portion of our opinion and only that portion of Frank's testimony necessary to our resolution of this appeal in the analysis section below. King offered the testimony of Frank to support the allegation that King's exposure to diesel exhaust while working for BNSF was the cause of King's multiple myeloma. BNSF offered the expert testimony of a different doctor, who opined that diesel exhaust does not cause multiple myeloma. BNSF argued that Frank's expert medical opinion was unreliable and, thus, not admissible. Specifically, BNSF argued that neither the medical or scientific community nor any medical or scientific literature supported Frank's opinion. Conversely, King argued that Frank's opinion met the reliability standards set forth in Nebraska case law and that thus, a fact finder should determine the credibility of Frank's opinion. After reviewing the evidence, briefs, and arguments of the parties, the district court concluded that Frank should be excluded from testifying, and it entered an order on October 21, 2005, granting BNSF's motion in limine. We have set forth the specific details of the reasoning employed by the court in reaching its decision in the analysis section below.
On November 16, 2005, counsel for the parties appeared before the district court for a further hearing, upon BNSF's motion for summary judgment. The court heard arguments from counsel and also considered the evidence previously received at the hearing on the motion in limine. The court also received a written motion from King for additional time to designate expert witnesses and heard arguments in connection with that motion. On November 23, the court entered an order granting BNSF's motion for summary judgment and denying King's motion for additional time to designate expert witnesses. The court found that BNSF had satisfied its burden of adducing evidence demonstrating that there was no causal connection between King's employment, including his exposure to diesel exhaust, and his subsequent development of multiple myeloma. Because King had not satisfied the burden of producing evidence sufficient to demonstrate that a genuine dispute of material fact existed, the court granted BNSF's motion for summary judgment. This timely appeal followed.

ASSIGNMENTS OF ERROR
King asserts that the district court erred in (1) excluding Frank's testimony and (2) failing to allow King to obtain other expert testimony after disallowing Frank's testimony.

STANDARD OF REVIEW
[1-3] Courts of the United States and courts of the several states have concurrent jurisdiction over claims controlled by FELA. Wagner v. Union Pacific RR. Co., 11 Neb. App. 1, 642 N.W.2d 821 (2002). In disposing of a claim controlled by FELA, a state court may use procedural rules applicable to civil actions in the state court unless otherwise directed by FELA, but substantive issues concerning a claim under FELA are determined by the provisions of FELA and interpretative decisions of the federal courts construing FELA. Id. Unlike substantive issues, procedural matters are governed by the law of the forum. Id.
[4-6] In proceedings where the Nebraska rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility. Epp v. Lauby, 271 Neb. 640, 715 N.W.2d 501 (2006). A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. Id. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. Id.

ANALYSIS

Exclusion of Frank's Testimony.
King alleges that as a result of his exposure to diesel exhaust during his 28 years of employment by BNSF, he developed multiple myeloma. On appeal, King asserts that the district court erred in excluding Frank's testimony regarding the causation of King's multiple myeloma. In evaluating the court's ruling on BNSF's motion in limine, we must consider, under our abuse of discretion standard, whether there was sufficient evidence presented to allow Frank to opine that exposure to diesel exhaust was the cause of King's multiple myeloma.
[7] Rule 702 of the Nebraska Evidence Rules governs the admissibility of expert opinion testimony. See Neb. Rev. Stat. § 27-702 (Reissue 1995). Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001), the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. Epp v. Lauby, supra. The Nebraska Supreme Court has described a trial court's evaluation of the admissibility of expert testimony as essentially a four-step process, stating:
First, the court must determine whether the witness is qualified to testify as an expert. If the expert is and it is necessary for the court to conduct a Daubert analysis, the court must next determine whether the reasoning or methodology underlying the expert testimony is scientifically valid and reliable. Once the reasoning or methodology has been found to be reliable, the court must next determine whether the methodology was properly applied to the facts in issue. Finally, the court determines whether the evidence and opinions related thereto are more probative than prejudicial, as required under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995).
Epp v. Lauby, 271 Neb. at 646-47, 715 N.W.2d at 508.
[8] In determining the admissibility of an expert's testimony, a trial court may consider nonexclusive criteria in evaluating the reliability of a particular theory to include (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within the relevant scientific community. Epp v. Lauby, supra.
The district court found no question that Frank was eminently qualified to give expert medical testimony. However, the court found that Frank's opinion was not based on reliable methodology and, thus, excluded Frank from testifying for King. Frank opined that King's exposure to diesel exhaust fumes, which contain benzene, a known carcinogen, over a 28-year period of working for BNSF caused King to contract multiple myeloma. Frank reached this conclusion by examining the "'totality of the information available regarding multiple myeloma, benzene and diesel exhaust." In Frank's opinion, a person exposed to diesel exhaust and benzene above a base level over an extended period of time can be expected to be at risk to contract multiple myeloma because as the level of exposure increases, the risk increases. Given the length of time King was exposed to diesel exhaust, Frank concluded to a reasonable degree of medical certainty that this exposure was the cause of King's multiple myeloma.
In King's brief on appeal, numerous studies relied on by Frank to support his opinion are cited. King similarly cited such studies to the district court, which concluded that Frank's reliance on the "'totality of information regarding multiple myeloma, benzene and diesel exhaust" in opining diesel exhaust exposure causes multiple myeloma was not reliable and that Frank's testimony was thus not admissible under rule 702 and the standards set forth in Daubert and Schafersman. The district court observed that Frank's methodology in reaching his conclusion that exposure to diesel exhaust is a risk factor in causing multiple myeloma was specifically rejected by one court applying the same Daubert standards to determine admissibility of expert testimony. See Missouri Pacific R. Co. v. Navarro, 90 S.W.3d 747 (Tex. App. 2002). In Navarro, the court rejected one expert's opinion, that a railroad employee contracted multiple myeloma through her exposure to diesel exhaust, after the court concluded that the expert's methodology was flawed.
In Navarro, that expert based his conclusion on two studies dealing with diesel exhaust and multiple myeloma. However, the Navarro court, discussing one study, stated that it was impossible to tell whether the railroad workers in that study who died from multiple myeloma were even exposed to diesel exhaust and that the study noted that because there were only three such deaths, there was no statistically significant relationship between railroad workers' diesel exhaust exposure and multiple myeloma. The Navarro court also noted that the second study did not conclude that diesel exhaust exposure caused multiple myeloma. That expert also acknowledged that other studies concluded that there was no relationship between multiple myeloma and diesel exhaust, but he testified that he rejected those studies. The Navarro court noted that although the expert based his opinion on two studies, he chose to ignore the studies' conclusions and instead reached his own conclusion based on the data contained in those studies. The court also rejected the expert's opinion because he was unable to state the level of exposure required and was not involved in any research or publications dealing with diesel exhaust exposure and multiple myeloma. Id.
The Navarro court further stated that all of the plaintiff's expert witnesses who testified that diesel exhaust exposure causes multiple myeloma were unreliable. The court stated that the experts' opinions were subjective because they were not supported by any studies, the methodology the experts employed to reach their conclusions had no known potential rate of error, and the experts' opinions were not generally accepted in the scientific community. The court pointed out that the plaintiff's experts were "alone in the scientific community in their opinions that exposure to diesel exhaust causes multiple myeloma." Id. at 758.
In the present case, the district court concluded that Frank offered the same opinion, based on the same methodology that was rejected in Navarro. The court found that like the experts in Navarro, Frank could not point to a study that concluded exposure to diesel exhaust causes multiple myeloma. The court further found that Frank could not state the level of exposure to diesel exhaust that creates a risk for multiple myeloma. The court observed that Frank was not directly involved in any research or studies dealing with diesel exhaust exposure and multiple myeloma and that he had simply relied on the "`totality of information regarding multiple myeloma, benzene and diesel exhaust" to reach his own subjective conclusions regarding diesel exhaust exposure and multiple myeloma. The court noted, as did the court in Navarro, that such method had no known rate of error and resulted in a subjective opinion that was not supported by any studies or accepted within the scientific or medical community.
In Schafersman v. Agland Coop, 262 Neb. 215, 222, 631 N.W.2d 862, 871 (2001), the case in which the Nebraska Supreme Court adopted the Daubert standard, the court rejected expert opinion testimony that relied on "multiple mineral toxicity," a theory that was not generally accepted or recognized in any scientific field. The Schafersman court had concluded under a former test based on Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), that an expert's opinion that "multiple mineral toxicity" affected cows' ability to produce milk was not reliable and thus not admissible because multiple mineral toxicity was not a generally accepted theory. 262 Neb. at 222, 631 N.W.2d at 871. In Schafersman, the court noted that the expert had neither studied "multiple mineral toxicity" nor authored any publications concerning it, had cited no controlled studies related to that theory, and also had conceded that there was no standard to determine what levels of minerals would cause a toxic effect on the cows. 262 Neb. at 221, 631 N.W.2d at 869.
On a subsequent appeal following remand for a new trial in which the Daubert standard was applied, the Nebraska Supreme Court found it unnecessary to consider whether the expert's revised theory of multiple mineral toxicity was reliable under Daubert. In its opinion, see Schafersman v. Agland Coop, 268 Neb. 138, 681 N.W.2d 47 (2004), the Nebraska Supreme Court noted that the lack of independent hard scientific support for multiple mineral toxicity was not the only reason the trial court gave for excluding the plaintiffs' experts. The trial court also excluded the experts because they had failed to perform a reliable clinical analysis, specifically noting that none had conducted a differential diagnosis. The Nebraska Supreme Court found that the plaintiffs' experts had not taken any substantive steps to shore up the weaknesses previously identified in the clinical analysis and accordingly found that the trial court did not abuse its discretion in refusing to admit the expert opinion testimony of the plaintiffs' witnesses.
The district court in this case noted that a federal circuit court of appeals applying the Daubert standard recently rejected expert opinion testimony based on methodology similar to that employed by Frank. In McClain v. Metabolife Intern., Inc., 401 F.3d 1233 (11th Cir. 2005), an expert testified that the ephedrine combined with caffeine in a weight-loss product caused heart attacks because ephedrine was classified within a drug family that causes blood vessel constriction and increased pulse rate and blood pressure, which over the long term can lead to narrowing and inflammation of the blood vessels, which can lead to heart attacks and strokes. The court ruled the opinion inadmissible because it was speculative and because the expert unjustifiably relied on consumer and government reports and inferred conclusions from studies and reports not authorized by those studies and reports. Id. The court also rejected the expert's opinion because he based his conclusion on a comparison of ephedrine and its symptoms to another, similar drug, phenylpropanolamine, and its symptoms. The court stated that such Thlubjective speculation ...' does not provide good grounds for the admissibility of expert opinions." Id. at 1245. The McClain court further noted that the expert's reliance on medical studies and reports was not justified, because the studies and reports did not authorize his opinions. For example, although the expert concluded that ephedrine, when mixed with caffeine, was the cause of heart attacks and strokes, the studies merely concluded that such a mix "`in some patients may cause toxicity" and only "`could increase the risk of adverse effects." Id. at 1247 (emphasis omitted).
In this case, the district court found Frank's methodology to be similarly flawed. The court observed that Frank pointed to numerous studies, some of which dealt with exposure to diesel exhaust or benzene and to multiple myeloma, yet he could not point to a single study that conclusively stated that exposure to diesel exhaust or benzene causes multiple myeloma. The court noted that one study relied on by Frank stated that diesel exhaust "may be a risk factor," while another study stated that "`some studies of (engine exhaust) did show a significant association with multiple myeloma.'" However, the district court found that no study relied on by Frank reached the same conclusion as Frank. The court concluded that ultimately, Frank combined the data contained in the studies to reach his own speculative and subjective conclusion that diesel exhaust exposure causes multiple myeloma.
In short, the district court found that Frank's opinion was not reliable because his opinion was based on his own subjective conclusions and flawed methodology, because no medical or scientific study had concluded that diesel exhaust exposure causes multiple myeloma, and because the underlying methodology of Frank's opinion was unreliable. It concluded that his testimony was thus not admissible under the Nebraska Evidence Rules and expert testimony reliability standards established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001).
[9] Both before the district court and on appeal to this court, King argues that Frank engaged in a differential diagnosis or differential etiology, which the district court noted is a standard scientific technique under which a medical condition is diagnosed by eliminating all the likely causes until the most probable one is isolated. The technique has been accepted in the medical community, and its use has been upheld in both federal and Nebraska courts. See, Carlson v. Okerstrom, 267 Neb. 397, 675 N.W.2d 89 (2004); Boren v. Burlington Northern & Santa Fe Ry. Co., 10 Neb. App. 766, 637 N.W.2d 910 (2002). In Carlson, the Nebraska Supreme Court emphasized that an expert's opinion is not admissible simply because the expert conducted a differential diagnosis, but that the court must determine whether the expert conducted a reliable differential diagnosis. In performing a differential diagnosis, a physician begins by "ruling in" all scientifically plausible causes of the patient's injury. Id. The physician then "rules out" the least plausible causes of injury until the most likely cause remains. Id.
In analyzing the second step of a differential diagnosis under the Daubert/Schafersman framework, the question is whether the expert had a reasonable basis for concluding that one of the plausible causative agents was the most likely culprit for the patient's symptoms. In other words, the expert must be able to show good grounds for eliminating other potential hypotheses.
Carlson, 267 Neb. at 414, 675 N.W.2d at 106.
In Carlson, the court concluded that an expert's opinion, that a neurogenic bladder condition suffered by one of the plaintiffs was caused by an impact to the abdominal area of his body in a traffic accident, was based on a reliable differential diagnosis. The expert originally did not have an opinion as to the cause of the condition, but only ruled out infection. After reviewing the medical examinations of other doctors, the expert ruled out other causes such as a urinary tract obstruction, spinal cord injury, and multiple sclerosis. When the expert reexamined the plaintiff, he found that the plaintiff had an enlarged prostate, which condition had developed 4 years after the initial bladder problems. The expert concluded that the plaintiff suffered from enlarged prostate and neurogenic bladder. The expert then concluded that the cause of the neurogenic bladder condition was the automobile accident because the condition developed within weeks of the accident. The Carlson court noted that the expert ruled out other causes based on his own physical examination of the plaintiff, along with examinations conducted by other doctors. The court concluded that the differential diagnosis was reliable because the expert relied on the temporal connection between the symptoms and the accident, and it was undisputed that such trauma was capable of causing neurogenic bladder. Id.
Unlike the Carlson case, where the parties did not dispute that trauma could cause the condition at issue or whether the expert had properly ruled in potential causes of the injury, the present appeal concerns whether exposure to diesel exhaust can be a possible cause of multiple myeloma. The district court found "no evidence that ... Frank considered any other potential causes of ... King's multiple myeloma, why those potential causes were eliminated and why ... King's exposure to diesel exhaust is the most probable cause." In his deposition, Frank was asked if he employed the process of ruling in and ruling out either known causes or known risk factors in making his opinions or judgments with respect to etiology. Frank responded lyles" without further explanation. Elsewhere in his deposition, Frank noted exposure to radiation as a possible cause, but he found no evidence of any unusual exposure to radiation. Frank stated, however, that there were no possible associations of multiple myeloma with chemicals that he researched in connection with King's illness other than the association with diesel exhaust. Frank also found articles with respect to associations of multiple myeloma and smoking, which "all appeared to be negative" associations. Frank made no specific comparison of associations between diesel exhaust and multiple myeloma and associations between smoking and multiple myeloma. Frank was asked if there was an association with farmwork, and he agreed that there was some association between multiple myeloma and exposure to pesticides. Similarly, Frank made no specific comparisons between that association and the associations with exposure to diesel exhaust. Frank noted a possible connection with diabetes as well, but stated it was not relevant in King's case because "it's not a disease that he had." Frank agreed that King had worked on a farm at one point in his life and that in working on a farm, he would have had the possibility of working with pesticides.
The district court determined that Frank's differential diagnosis was not reliable. The court determined that the record did not show what causes other then diesel exhaust exposure Frank considered in his differential diagnosis. The court further determined that in the first step of the differential diagnosis, Frank "`ruled in" diesel exhaust exposure as a possible cause, even though no medical or scientific study concluded that such exposure causes multiple myeloma. Finally, the court determined that in the second step, Frank did not state why he "`ruled out" any other potential causes, but merely concluded that diesel exhaust exposure was most probableagain, even though no medical or scientific study authorizes such a conclusion.
King argues that this court has previously accepted Frank's opinion based on a differential diagnosis. See Boren v. Burlington Northern & Sante Fe Ry. Co., 10 Neb. App. 766, 637 N.W.2d 910 (2002). In Boren, Frank used a differential diagnosis to conclude that a plaintiff's exposure to various chemicals caused him to contract cirrhosis. However, in Boren, Frank and another expert testified that medical journals and peer-reviewed articles "indicated that exposure to the various chemicals involved ... can cause cirrhosis." 10 Neb. App. at 776, 637 N.W.2d at 920. In Boren, Frank also testified that the plaintiff was exposed to various chemicals over a period of years, that such exposure could cause medical problems, and that there was evidence to rule out other causes. He also testified that the plaintiff had acute reactions to the chemicals on numerous occasions, such as skin reactions, breathing problems, and headaches. Id.
In the present case, the district court concluded that although differential diagnosis is a generally accepted methodology, Frank had not performed a reliable differential diagnosis. The court further concluded that because Frank's opinion was not based on reliable methodology, his testimony must be excluded under the Nebraska Evidence Rules and expert testimony reliability standards established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001).
Having reviewed the record, including the district court's well-reasoned opinion and Frank's deposition testimony, and the relevant case law, we find no abuse of discretion in the district court's decision to grant BNSF's motion in limine and exclude Frank's testimony.

Other Expert.
King asserts that the district court erred in failing to allow King to obtain other expert testimony after disallowing Frank's testimony. King states that the motion for additional time to designate expert witnesses was filed because the court failed to set out with sufficient particularity its reasoning in determining that Frank's differential diagnosis or etiology was deficient. We note that the district court wrote a 10-page opinion explaining its reasoning in support of its order granting the motion for limine. King argues that BNSF would not have been prejudiced had the court granted King's motion, since King was deceased by that point and there was no issue of ongoing damages. In denying the motion during proceedings on November 16, 2005, the court stated:
I will just say that I think I spent a good deal of time trying to make my order very clear. I don't think it was exceedingly complicated. I think the science was such that it required me to make such a decision, and that's about all I'll say on it.
Therefore, the motion for additional time to designate an expert witness is denied.
[10] At the November 16, 2005, hearing on BNSF's motion for summary judgment, which occurred subsequently to the hearings on the motion in limine and issuance of the district court's ruling thereon, the court indicated that it had just received King's motion for additional time. In essence, King sought a continuance of the summary judgment hearing. A continuance authorized by Neb. Rev. Stat. § 25-1335 (Reissue 1995) (continuance of summary judgment hearing for further discovery) is within the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. Newman v. Thomas, 264 Neb. 801, 652 N.W.2d 565 (2002). There is not a copy of the original petition in our record, but the operative petition was filed in December 2001. Clearly, the case had been at issue for quite some time by the time of the November 16, 2005, hearing. The record does not contain a copy of King's motion for additional time, and there is nothing in the bill of exceptions for the November 16 hearing to indicate that King had identified any possible experts other than Frank who might testify as to the causation of King's multiple myeloma. The initial hearing on BNSF's motion in limine and motion for summary judgment was held on July 20, 2005, and the possible need for an additional expert witness in the event that BNSF prevailed on the motion in limine would have been apparent at that time, months before King's motion for additional time. We find no abuse of discretion in the court's denial of King's motion.

CONCLUSION
The court did not abuse its discretion in granting the motion in limine to exclude Frank's testimony or in denying King's motion for additional time to designate expert witnesses.
AFFIRMED.