IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

ENSIGN V. BNSF RY. CO.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RANDY ENSIGN, APPELLANT,
V.
BNSF RAILWAY COMPANY, A CORPORATION, APPELLEE.

Filed January 21, 2014.    No. A-13-112.

Appeal from the District Court for Box Butte County: TRAVIS P. O'GORMAN, Judge. Affirmed.

Andrew Snyder, of Chaloupka, Holyoke, Snyder, Chaloupka, Longoria & Kishiyama, and Roger C. Denton and Elizabeth Wilkins, of Schlichter, Bogard & Denton, L.L.P., for appellant.

Nichole S. Bogen and Thomas C. Sattler, of Sattler & Bogen, L.L.P., for appellee.

INBODY, Chief Judge, and MOORE and RIEDMANN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Randy Ensign filed a complaint in the district court for Box Butte County under the Federal Employers' Liability Act (FELA) for shoulder injuries he sustained while working for BNSF Railway Company (BNSF). A jury trial was held, and the court granted BNSF's motion for directed verdict at the close of Ensign's case. Ensign appeals. Because Ensign failed to present sufficient evidence to support his claim that BNSF knew or should have known of a potential hazard in the workplace and yet failed to exercise reasonable care to inform and protect its employees, the district court did not err in granting BNSF's motion for directed verdict. Accordingly, we affirm.

## II. BACKGROUND

In September 1990, Ensign began his employment with BNSF in Alliance, Nebraska, as an apprentice carman, training in multiple jobs. After the apprenticeship of approximately 60 days, he worked as a carman in the shop for 2 or 3 years. Thereafter, Ensign worked for about 15 years as an inspector and/or airman in the Alliance yard. Ensign then returned to the shop as a car mover until his report of injury in 2008. Carman duties were part of that position, which also involved driving cars in and out of the shop.

On August 1, 2008, Ensign reported to Andrew Callahan, a general foreman in the BNSF shop, that he had been to the doctor and needed shoulder surgery. A personal injury report was completed on August 1. Ensign eventually had surgery on both shoulders, and because of work restrictions, he did not return to work at BNSF.

Ensign filed a complaint in the district court on January 11, 2010, alleging that he was employed by BNSF between September 10, 1990, and July 29, 2008, and that he suffered injuries to his shoulders while employed by BNSF. Specifically, he alleged that throughout his employment, he was required to work in conditions which subjected him to frequent and/or repetitive stress, strain, impact, and jarring; to work with and lift, move, and carry heavy objects; and to otherwise engage in work activities requiring continuous, frequent, and/or repetitive use of his shoulders. Ensign alleged that BNSF was negligent and breached its duty to provide him with a reasonably safe workplace by failing to provide a reasonably safe place and conditions in which to work; failing to provide reasonably safe and adequate equipment to perform the work; failing to warn Ensign of the ergonomic dangers of his work and to perform an ergonomic risk analysis of his work; and failing to adopt, implement, install, enforce, and/or carry out safe customs, methods, procedures, and practices for inspecting, maintaining, and/or repairing its equipment and/or locomotives in an ergonomically safe manner. Ensign alleged that his injuries were due in whole or in part to one or more of these negligent acts or omissions, as well as other acts of negligence in violation of the FELA, and that he was unaware of the permanent nature of his injuries and the need for surgery or that his work at BNSF caused his injuries until less than 3 years before his complaint was filed. Ensign alleged that his shoulder injuries resulted in damages of severe pain and suffering, psychological and emotional injury, mental anguish and anxiety, medical expenses, and losses in wages, benefits, and earning capacity and that he would continue to suffer these damages.

BNSF answered, denying the cause of Ensign's injuries and denying that it was negligent.

A jury trial was held on January 28 through 30, 2013. The evidence included testimony from Ensign; Callahan; Tad Shallenberger, a carman in the Alliance shop; Danny Stefka, a carman supervisor in the Alliance shop; deposition testimony from Dr. Brian Scheer, an orthopedic surgeon; a vocational rehabilitation counselor; and numerous exhibits.

### 1. REPORT OF INJURY

On August 1, 2008, Ensign went to Callahan's office and reported that he had been to the doctor and needed shoulder surgery. Ensign told Callahan he thought he had worn his shoulders out at work over time. Ensign had not reported any shoulder problems to Callahan or anyone else at BNSF prior to August 1. Based on this conversation with Ensign, Callahan understood that

Ensign had had a problem with at least one of his shoulders for over a year. According to Callahan, Ensign did not report the occurrence of a specific incident and did not identify a specific task, a particular tool, or a work process that was causing him injury.

The personal injury report, dated August 1, 2008, was received into evidence. In the report form, Ensign indicated that he first noticed symptoms "? 3 month ago" and that he was first treated or diagnosed in May 2008. He indicated that an MRI on July 29 revealed that both of his "rotator cup[s] [sic]" were torn. In the section of the form asking for a description of how the injury, illness, or condition occurred, Ensign wrote "deteriorated over time" and in the section asking about the type of medical attention administered, he wrote "exam & surgrie [sic]." Ensign checked "No" in boxes inquiring whether the accident was caused by the conduct of another person, whether he could have prevented his injury, and whether there were any defects, malfunctions, or problems with the equipment or work procedures.

A fitness for duty recommendation form from BNSF's medical department shows that as of August 1, 2008, Ensign had temporary restrictions of "no overhead work, no heavy lifting, [and] no repetitive movements" but was unable to be accommodated with those restrictions. This form also shows that he was scheduled for surgery August 13, would have a second surgery approximately 3 months later, and would be off work until cleared for return to work.

Callahan is responsible for receiving injury reports, and he investigates or has oversight of injury investigations. Callahan testified that because Ensign did not report a task or procedure in connection with his injury, there was nothing for Callahan to investigate. Callahan contacted the director of safety for the division to confirm that he did not need to investigate further, since there was no task identified in the injury report. Callahan testified that if there is a specific task identified as causing an injury, the railroad will attempt a reenactment with the safety assistant or any coworkers, determine whether there were any witnesses, and then "do an analysis [of] what we can do different to prevent it."

During his trial testimony, Ensign agreed that after he began experiencing problems with his shoulders, he never reported having difficulties with any of the tools or equipment he was using, he never inspected for or reported any defects related to his tools or equipment, he never requested different or alternative tools or equipment to perform his duties, and he never requested reassignment of his work duties to alleviate any of the shoulder problems he was experiencing at work. When Ensign was asked if he claimed that "every task of every job [he] ever did for the BNSF" contributed to his injury, he replied, "I'm not for sure what caused it."

### 2. JOB TASKS OF CARMAN

Ensign, Shallenberger, and Stefka all testified consistently about the job requirements and duties of a carman. Daily tasks of a carman include changing brake shoes, changing out wheels and couplers, and repairing cars. These tasks involve, among other things, lifting, reaching, pulling, pounding, exerting force and pressure with the arms, some repetitive work, kneeling, and working in awkward positions. The work involves some use of heavy tools. Employees are not doing the same tasks over and over again in succession, because the work required on the cars that come in for repair varies. Not all of the carman's work is heavy-duty work, but it is a requirement to be able to lift. The carmen work at their own pace. Assistance with tasks is always available from coworkers, and equipment is available to aid in moving heavy objects.

The carmen look out for one another, and safety is a primary concern. According to both Shallenberger and Stefka, the carmen in the Alliance shop are experienced and are well-trained and well-equipped by BNSF. Employees can request additional or different tools to do their jobs, and management is responsive to those requests.

### 3. SAFETY TRAINING

Employees at BNSF in Alliance are required to undergo annual safety certification, which includes mechanical safety rules and instruction on proper lifting. Employees are informed not to manually strain themselves, and they are encouraged to bring any safety concerns to the attention of the supervisor. Annual safety audits are performed by the supervisors. BNSF has a safety assistant position, and according to Callahan, managers are always looking at the different tasks performed. In addition, systems safety initiatives are received from the corporate headquarters, which offer different tools and mechanical advantages for the tasks specific to the carmen, machinists, and electricians. These initiatives are reviewed to determine whether the tasks are being performed in Alliance and should be implemented.

The issues of ergonomics and cumulative trauma injuries were discussed at trial. Callahan testified that although there is no one specifically in charge of ergonomics in the Alliance shop, the individual in charge of safety at Alliance does ergonomic training in the workforce; however, there is no specific training on cumulative trauma injuries. Shallenberger testified that he had received training from BNSF regarding ergonomics. The training regarding the upper body, shoulders, or reaching or extending, included advising employees not to reach above head level to remove items from shelves. Stefka had not received training or provided training to other employees about avoiding repetitive stress injuries, although he was aware of prior testing relating to carpal tunnel issues. Ensign testified that the carmen had good training on lifting and safety but that they were never given training on how to safely ergonomically utilize the upper arms and shoulders. Ensign agreed that his trainer offered assistance whenever he needed it, made sure Ensign understood the rules and followed them, and taught Ensign how to work safely at the railroad.

Callahan testified that there are cumulative trauma injuries reported from the carmen in Alliance "all the time." He later clarified that Alliance had only had nine injuries in 5 years. In that portion of his testimony, he did not specify whether he was referring to cumulative trauma injuries or just injuries in general. Callahan did not recall any of the nine injuries being shoulder injuries. His testimony indicates that there were other injuries more than 5 years prior to trial and that some of those injuries were shoulder injuries. When cumulative trauma injuries are reported, BNSF looks into what type of work the injured worker was performing, and then the reported injury is turned over to medical and claims staff at the corporate headquarters. Callahan testified that occasionally, someone will come out and assess the workplace to determine why the cumulative trauma claims are occurring, but he later testified that he was not aware of anyone else looking into cumulative trauma injuries at Alliance during the time he had been there. Callahan was not aware of any safety studies or workplace assessments done by BNSF specifically to look into cumulative trauma disorders in Alliance.

## 4. MEDICAL EVIDENCE

Scheer, an orthopedic surgeon, first saw Ensign on July 29, 2008. Ensign complained that he had been experiencing bilateral shoulder pain for 1 year. Ensign reported that he worked for the railroad and felt the pain was a repetitive or accumulative trauma episode from his heavy lifting. Ensign reported lifting upward of 100 pounds, multiple times a day, which had caused shoulder pain without specific or definite injury. Ensign reported that he was experiencing sleep issues, that he was taking certain pain medications that had helped some, and that he had had MRI's of his shoulder. Prior to seeing Scheer, Ensign had been diagnosed with impingement. Scheer's examination of Ensign revealed that he had bilateral rotator cuff tears, with the left shoulder being worse than the right. Scheer restricted Ensign to no heavy lifting, no repetitive movements, and no overhead activity. Scheer recommended surgical intervention and performed the surgery to repair Ensign's left shoulder. Another doctor performed surgery on Ensign's right shoulder. Scheer saw Ensign again in January 2010, about a year after his right shoulder surgery, and felt at that time that Ensign had reached maximum medical improvement.

Scheer testified that rotator cuff tears and the pathology associated with tears are "multifactorial." According to Scheer, a person can be somewhat predisposed by his anatomy, and it can be based on age, function, and activity. Scheer testified that repetitive tasks could affect a person predisposed to such injuries depending on the type of motion. According to Scheer, Ensign was predisposed to impingement based on his morphology of bone. Scheer opined that people, including Ensign, who perform repetitive tasks that require them to flex and internally rotate and/or abduct or reach, can be predisposed to further trauma to their shoulder, including rotator cuff tears. However, Scheer was not aware of the specific type of repetitive work Ensign performed or the amount of weight he typically lifted. Scheer also testified that once an individual has impingement, it can be exacerbated by all kinds of activities.

## 5. DIRECTED VERDICT RULING

At the close of Ensign's evidence, BNSF moved for a directed verdict. The district court ruled from the bench as follows:

> I have taken a look at the case law that's been cited to me and considered the arguments of counsel. . . .
>
> When I look at the evidence in this case, I think that there is evidence that these injuries were caused . . . at the place of employment. What I see as lacking, however, is any evidence at all of any negligence on the part of the railroad.
>
> When I look at the other cases I have been cited to, in all of those there was some evidence of someone indicating that certain ergonomic things could have been done differently or should have been done differently. And I don't hear any of that in this case at all.
>
> All of the testimony related to safety and things of that nature, even . . . Ensign said he was taught to do this in a safe manner.
>
> And . . . even with the standard being what it is, a scintilla of evidence, I don't see a scintilla of evidence here [of] any negligence on the part of the railroad.

So based on that, I think the law requires me to grant [BNSF's] directed verdict and dismiss the action, so I will do so.

On February 4, 2013, the court entered a written order granting BNSF's motion for directed verdict. Ensign subsequently perfected his appeal to this court.

## III. ASSIGNMENT OF ERROR

Ensign asserts, restated, that the district court erred in granting BNSF's motion for directed verdict.

## IV. STANDARD OF REVIEW

FELA preempts state law and statutorily supplies uniform law controlling a railroad employee's claim for damages caused by negligence of the employer railroad while the employee is engaged in the railroad's interstate commerce activity. *Boren v. Burlington Northern & Santa Fe Ry. Co.*, 10 Neb. App. 766, 637 N.W.2d 910 (2002). Courts of the United States and courts of the several states have concurrent jurisdiction over claims controlled by FELA. *Boren, supra*. In disposing of a claim controlled by FELA, a state court may use procedural rules applicable to civil actions in the state court unless otherwise directed by the act, but substantive issues concerning a claim under the act are determined by the provisions of the act. *Boren, supra*. Procedural matters are dictated by the law of the forum. *Id.*

In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Guinn v. Murray*, 286 Neb. 584, 837 N.W.2d 805 (2013). In considering an appeal from an order granting a motion for directed verdict at the close of the plaintiff's case, an appellate court must determine whether the cause of action was proved and in so doing must consider the plaintiff's evidence as true and give the plaintiff the benefit of reasonable conclusions deducible from that evidence. *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001).

## V. ANALYSIS

Ensign asserts that the district court erred in granting BNSF's motion for directed verdict. He argues that he provided enough evidence that BNSF breached its duty to provide him with a safe workplace to overcome BNSF's motion for directed verdict.

### 1. FELA LAW

Under FELA, railroad companies are liable in damages to any employee who suffers injury during the course of employment when such injury results in whole or in part due to the railroad's negligence. *Holsapple v. Union Pacific RR. Co.*, 279 Neb. 18, 776 N.W.2d 11 (2009). To recover under FELA, an employee must prove the employer's negligence and that the alleged negligence is a proximate cause of the employee's injury. *Deviney v. Union Pacific RR. Co.*, 18 Neb. App. 134, 776 N.W.2d 21 (2009). The common-law elements of negligence include duty, breach, foreseeability, and causation. *Id.* A railroad has a nondelegable duty to provide its

employees with a reasonably safe place to work. *Kuhnel v. BNSF Railway Co.*, 20 Neb. App. 884, 834 N.W.2d 803 (2013). Although not explicitly stated in the statutes, a railroad's duty to use reasonable care in furnishing employees a safe place to work has become an integral part of FELA. *Kuhnel, supra.* An employer breaches its duty to provide a safe workplace when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees. *Deviney, supra.*

In *McNeel v. Union Pacific RR. Co.*, 276 Neb. 143, 753 N.W.2d 321 (2008), the Nebraska Supreme Court discussed the existence of a "relaxed standard" for proving causation in FELA cases. The court noted that this "relaxed standard" was called into question by the U.S. Supreme Court's decision in *Norfolk Southern R. Co. v. Sorrell*, 549 U.S. 158, 127 S. Ct. 799, 166 L. Ed. 2d 638 (2007). The court in *McNeel* concluded that the appropriate principle governing a FELA case is that "'a court cannot allow a jury to speculate concerning the cause of an employee's injuries and must withhold or withdraw the employee's case from the jury unless evidence provides a basis for the reasonable inference that the employee's injury was caused by the employers' negligence.'" 276 Neb. at 151, 753 N.W.2d at 328.

## 2. CASES ARGUED BY PARTIES

The parties direct our attention to certain FELA cases in other jurisdictions that discuss whether the plaintiffs in those cases proved that their railroad employers breached their duty to provide a safe workplace. We consider each of those cases in turn, beginning with two cases where the court found sufficient evidence of negligence and then considering two cases in which the evidence was insufficient.

First, in *Aparicio v. Norfolk & Western Ry. Co.*, 84 F.3d 803 (6th Cir. 1996), *abrogated on other grounds, Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), the plaintiff worked for the railroad between 1976 and early 1994. During most of his career at the railroad, he worked as a track maintenance laborer, a job that required him to work with many types of tools. In 1987, the plaintiff sought treatment for numbness and tingling in his right hand, which resolved with conservative treatment. In 1992, the plaintiff sought treatment for pain in both hands and wrists, was diagnosed with carpal tunnel syndrome, and received surgical treatment. After returning to work, the plaintiff informed the railroad that he had carpal tunnel syndrome because of his work, but the railroad returned him to the same duties without any modifications after his surgeries. In 1993, the plaintiff experienced pain in his right elbow, was diagnosed with epicondylitis, and ceased working in early 1994 after several months of treatment. When he filed suit, the plaintiff claimed that the railroad was negligent in that it required him to work in a way that exposed his upper extremities to repetitive trauma, failed to evaluate trauma to his upper body, failed to advise him of the risk of carpal tunnel syndrome, and failed to redesign his job functions to be ergonomically sound. At trial, the plaintiff presented expert testimony of ergonomic risk factors and known remedial measures that had been described and accepted by the scientific community. He also presented evidence of the railroad's ergonomics program, a program that attempted to identify and reduce risk factors through engineering changes or job rotations and breaks. The trial court granted summary judgment in favor of the railroad. On appeal, the Sixth Circuit in *Aparicio* held that the plaintiff had presented "more than a scintilla" of evidence to show that the railroad should have known he

was at risk for developing a cumulative trauma injury to his upper extremities and that a reasonably prudent employer would have taken steps to alleviate the risk. 84 F.3d at 811. The court found that a reasonable jury could have concluded that a reasonably prudent employer would have known about risk factors for carpal tunnel syndrome, that the railroad should have known that the plaintiff's job duties placed him at risk for carpal tunnel syndrome, and that the railroad had breached its duty by failing to take remedial measures to reduce the plaintiff's exposure to repetitive vibration and shocks. The Sixth Circuit also found sufficient evidence of causation and foreseeability and reversed the summary judgment.

*Tufariello v. Long Island R. Co.*, 458 F.3d 80 (2d Cir. 2006), is another case in which the court found sufficient evidence that the railroad breached its duty of care. In that case, the plaintiff was employed as a mechanic in one of the railroad's railyards, where he was exposed to extremely loud train horn blasts, and he suffered permanent hearing loss. The plaintiff brought suit, claiming the railroad was negligent in failing to provide proper hearing protection in light of excessive noise and failing to provide reasonably safe work conditions and equipment. At trial, evidence was presented to show that the plaintiff and coworkers had complained about the loudness of the horns. The railroad had a program that provided hearing protection to employees exposed to a certain level of noise. The plaintiff testified, however, that he was never provided with any such protection. Also, a supervisor testified that he discouraged workers from wearing hearing protection. The trial court granted summary judgment in favor of the railroad. The Second Circuit reversed, however, holding that the plaintiff established a prima facie claim of negligence under FELA that the railroad breached its duty of care by exposing the plaintiff to hazardous noise without hearing protection and that such exposure caused him permanent hearing loss.

Next, in *Williams v. Burlington Northern and Santa Fe Ry.*, 13 F. Supp. 2d 1125 (D. Kan. 1998), the U.S. District Court for the District of Kansas sustained the railroad's motion for summary judgment holding that the plaintiff carman failed to produce sufficient evidence of the railroad's negligence in causing or contributing to cause his carpal tunnel injuries. In that case, the undisputed facts showed that the plaintiff had worked many years for the railroad and that since 1995, the plaintiff had worked as a carman, repairing railroad freight cars. As a carman, he used a variety of tools, he had received safety manuals on the use of the equipment, and he felt that he knew all of the safety measures. The plaintiff's job changed on a regular basis, but he usually worked on one specific task each day. He had the opportunity to take regular breaks and could use his discretion as to the duration and frequency of certain breaks. The plaintiff first felt pain in his hands when he began work as a carman, but he did not complain to his supervisor. He experienced pain with some of the jobs at his work but also with repetitious movement outside of his workplace.

In *Williams*, the plaintiff claimed that the railroad was negligent for failing to initiate a program to educate employees about the risk factors of carpal tunnel syndrome or to take steps to develop an ergonomic program to protect its employees. In its arguments to the court, the plaintiff cited testimony from the railroad's ergonomics and safety director, but apparently this testimony was not made a part of the record. The court held that, even if the director's testimony supported the allegations, the plaintiff's case could not survive summary judgment:

Even if the record contained such deposition testimony, plaintiff has failed to thereby demonstrate a genuine issue of material fact whether defendant breached its duty to provide a reasonably safe workplace. Plaintiff cites no record evidence that defendant knew or should have known that any specific tools which he used were unsafe or that any work tasks which he performed were unsafe. Plaintiff never complained to his supervisors, even when he was experiencing pain. Also, plaintiff received safety manuals on how to use his work tools, and he believes that he knows all of the safety measures even without the use of such manuals. Indeed, when asked what he felt defendant did wrong to cause the problems with his hands and wrists, plaintiff at his deposition answered, "[n]othing really." . . .

The mere allegation that defendant "knew about the existence of occupational carpal tunnel syndrome," even if true, provides no information with respect to the safety of plaintiff's particular workplace. Equally insufficient is plaintiff[']s conclusory allegation that "[c]early, in light of the failure of Defendant to properly educate and/or warn its employees of the dangers and risks of occupational carpal tunnel syndrome, the Defendant has failed to provide the Plaintiff with a safe place to work." Plaintiff cites no record evidence to demonstrate that the tasks plaintiff performed, or the frequency and duration of his tool use, created a workplace that was not reasonably safe, or if so, that defendant knew or should have known it was unsafe.

*Williams v. Burlington Northern and Santa Fe Ry.*, 13 F. Supp. 2d 1125, 1129-30 (D. Kan. 1998).

The *Williams* court distinguished *Aparicio v. Norfolk & Western Ry. Co.*, 84 F.3d 803, (6th Cir. 1996), *abrogated on other grounds, Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), because the plaintiff in *Williams* did not offer expert testimony regarding ergonomic risk factors in the workplace and known remedial measures accepted by the scientific community. Nor did the plaintiff in *Williams* present evidence of an ergonomics program such as that shown by the evidence in *Aparicio*, and the plaintiff in *Williams* did not inform the railroad of his pain. In *Williams*, the plaintiff's doctor attributed his injuries to years of repetitive, forceful, and awkward use of his hands, including the use of vibrating tools. The doctor did not discuss ergonomic risk factors in his report or known remedial measures of which the railroad should have known. There was no evidence in *Williams* showing that the railroad had used an ergonomics program to identify and reduce risk factors or to establish the railroad's knowledge of general studies regarding carpal tunnel syndrome. Because the plaintiff failed to present "even the slightest evidence of negligence," the *Williams* court found that the railroad was entitled to summary judgment on the claim that it had breached its duty of care. 13 F. Supp. 2d at 1131.

Finally, we consider *Lewis v. CSX Transp., Inc.*, 778 F. Supp. 2d 821 (S.D. Ohio 2011). In that case, the plaintiff worked in the railroad's track department and developed bilateral carpal tunnel syndrome. He sued, claiming that his exposure to occupational risk forces, including repetition, force, vibration, and awkward postures during his work caused or contributed to his carpal tunnel syndrome. The plaintiff argued that the railroad breached its duty to provide a reasonably safe workplace by failing to provide him with adequate assistance and manpower, adequate tools to safely perform his duties, and an adequate safety program to prevent or reduce

the risk of carpal tunnel syndrome. The railroad argued that the plaintiff failed to present more than a scintilla of evidence of the railroad's negligence and that he presented no admissible proof of causation. With respect to the adequacy of the tools and equipment provided to him, the court found that the plaintiff's description of his job duties was insufficient to support this claim. The plaintiff's testimony described the physical demands of operating certain equipment, specifying that he was required to repeatedly pull and push levers, that it was sometimes difficult for him to grip the machine's levers, and that operating it required him to place his hands in awkward positions. The court determined that without more, the plaintiff's testimony was not evidence that his job was unreasonably unsafe or that the railroad required him to perform his job in an unsafe manner. The court also held that even if the plaintiff had presented sufficient evidence to show that some problem existed with the equipment or manner in which he was required to use it, there is no evidence that the railroad had actual or constructive notice of any such problem. There was no evidence that the plaintiff reported to anyone at work that his work or a problem with the equipment was causing him difficulties with his hands. The plaintiff offered evidence that the railroad had knowledge of an increasing number of its employees that had filed claims related to carpal tunnel syndrome, but no witness testified as to the jobs those employees held, or the types of tasks they performed, and there was no evidence that any employee operating the same or similar machinery as the plaintiff filed a carpal tunnel claim. The court rejected the plaintiff's argument that the existence of a large number of claims generally equated to evidence that the plaintiff's specific work conditions were unsafe and that the railroad knew or should have known of the allegedly unsafe conditions. Finally, in considering the plaintiff's claim that the railroad should have provided a different or better comprehensive training and prevention program related to carpal tunnel syndrome, the court determined that "the mere fact that [the railroad] knew that a portion of its employees had developed carpal tunnel syndrome does not mean that [the railroad] knew or should have known that the particular work [the plaintiff] was assigned put him at risk for developing the disorder." *Lewis v. CSX Transp., Inc.*, 778 F. Supp. 2d 821, 842 (S.D. Ohio 2011). The court went on to state that "there must be some evidence that the railroad could reasonably have anticipated that an injury is a likely result of certain conditions before it can be said that the railroad breached a duty to address those conditions." *Id.* at 843. Also, although the plaintiff argued that the railroad was negligent in failing to institute a comprehensive safety program, he offered no suggestion as to what such a program would entail. The court found no evidence that the steps the railroad took to address carpal tunnel syndrome fell below the standard of care or that there were any specific ameliorative measures that the railroad could have but did not implement. The court in *Lewis* contrasted the evidence in that case with the testimony from the ergonomics expert in *Aparicio v. Norfolk & Western Ry. Co.*, 84 F.3d 803 (6th Cir. 1996), *abrogated on other grounds, Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). There was no such evidence in *Lewis*, and while the *Lewis* court did not hold that such evidence was required in FELA negligence cases, it did find that the plaintiff's evidence was insufficient. There was no evidence, other than the fact that the plaintiff developed carpal tunnel syndrome, that the tasks he performed, or the frequency or duration of the work, created an unreasonably unsafe work environment. Likewise, there was no evidence that the plaintiff's work involved risks of which the railroad knew or should have known, or that there were additional steps the railroad could

have taken to avoid the risks. Because there was insufficient evidence of negligence, the court declined to consider the issue of causation and granted summary judgment to the railroad.

### 3. APPLICATION OF LAW TO ENSIGN'S CLAIM

The evidence in the present case is more like that presented in *Williams v. Burlington Northern and Santa Fe Ry.*, 13 F. Supp. 2d 1125 (D. Kan. 1998), and *Lewis, supra*, than the evidence in *Aparicio, supra*, and *Tufariello v. Long Island R. Co.*, 458 F.3d 80 (2d Cir. 2006). In this case, Ensign did not complain about problems with his shoulders prior to reporting to Callahan on August 1, 2008. Ensign did not report any difficulties with the equipment to BNSF or problems with his job duties or request alternative tools or reassignment of his work duties at any time prior to the injury report or after he began experiencing problems with his shoulder. Ensign never raised any safety concerns. Upon reporting his shoulder injury, Ensign never identified a specific task or particular tool or work process that caused him injury.

Ensign and other witnesses testified at length about the rigors of the carman position, but a description of the carman duties without more is insufficient to show that the workplace was unreasonably unsafe. The evidence generally showed that the carmen in Alliance are well-trained and well-equipped workers. The carmen are given regular safety instructions, including the method of proper lifting. Ensign testified that he was taught how to properly perform his job and use the tools, was trained in the rules, and was taught how to work safely. Ensign was unable to identify what tasks caused his shoulder injuries.

Ensign presented no evidence that BNSF knew or should have known that any specific tools which he used were unsafe or that any work tasks which he performed were unsafe. Ensign presented no evidence to show that BNSF should have known that Ensign was at risk for developing a cumulative trauma shoulder injury.

There was no expert testimony about ergonomic risk factors and known remedial measures regarding the work performed by carmen at BNSF and repetitive injuries to shoulders. There was no evidence that BNSF had an ergonomics program to identify risk factors relative to repetitive shoulder injuries or to establish the railroad's knowledge of studies regarding shoulder injuries. There was no evidence that BNSF had actual or constructive notice of any such repetitive shoulder injuries. There was some evidence in the record about other cumulative trauma injuries in the Alliance car shop, but this evidence was very general, and there was no evidence to show whether these were the same types of injuries Ensign suffered to his shoulders. There was no evidence tying the cause of those injuries to any particular tasks at the railroad let alone to tasks performed by Ensign such that BNSF should have known that Ensign was at risk for cumulative trauma injury to his shoulders.

In conclusion, there was no evidence to support Ensign's claim that BNSF knew or should have known of a potential hazard in the workplace and yet failed to exercise reasonable care to inform and protect its employees. The district court did not err in granting BNSF's motion for directed verdict.

### VI. CONCLUSION

The district court did not err in granting BNSF's motion for directed verdict.

AFFIRMED.